[No. D020943. Fourth Dist., Div. One. Apr. 13, 1995.]

THE PEOPLE, Plaintiff and Appellant, v.
RUSSELL JOHN DOWNING, Defendant and Respondent.

## COUNSEL

Edwin L. Miller, Jr., and Paul J. Pfingst, District Attorneys, Thomas F. McArdle and Patricia O'Mara, Deputy District Attorneys, for Plaintiff and Appellant.

Francis J. Bardsley, Public Defender, Terry Zimmerman and Gary R. Nichols, Deputy Public Defenders, for Defendant and Respondent.

## OPINION

**HUFFMAN, Acting P. J.**—In this case we have explored the difficult question of the extent to which a police officer may rely upon computer-generated data furnished by the judicial system in carrying out searches and seizures. We conclude, consistent with the recent announcement by the United States Supreme Court in *Arizona* v. *Evans* (1995) 514 U.S. __ [131 L.Ed.2d 34, 115 S.Ct. 1185],[1] that where errors exist in such data based on mistakes made solely within the judicial system, the deterrent effect of the Fourth Amendment's exclusionary rule will not be served by suppressing evidence seized in a search based on the "objectively reasonable" good faith reliance of a police officer on the data generated by the judicial branch of our government, even though that data is later found to be in error and the search is determined to be unlawful.

---

[1]Shortly after oral argument in this matter, on March 1, 1995, the United States Supreme Court rendered its opinion in *Arizona* v. *Evans*, a case factually similar to this case. (See p. 1654, fn. 20, *post.*) We, therefore, requested supplemental briefing from the parties on the implications of that opinion on the issues in this case. After further consideration, we determine our interpretation of the federal exclusionary rule is in compliance with the principles enunciated by the United States Supreme Court in *Arizona* v. *Evans*. (*In re Lance W.* (1985) 37 Cal.3d 873 [210 Cal.Rptr. 631, 694 P.2d 744].)

Russell John Downing was charged with possession of a destructive device "in and near a private habitation" (Pen. Code,[2] § 12303.2) with a prior probation allegation after a homemade pipe bomb was seized from his bedroom during a warrantless search of his apartment pursuant to a Fourth Amendment probation waiver. The trial court granted his section 1538.5 suppression motion, ruling the search invalid as based upon a nonexistent waiver due to the termination of Downing's probation and that the "good faith" exception to the exclusionary rule, as established by *United States* v. *Leon* (1984) 468 U.S. 897 [82 L.Ed.2d 677, 104 S.Ct. 3405] (*Leon*), would not be applied to deny Downing his Fourth Amendment rights. Because the People were unable to proceed, the court dismissed the criminal information against Downing (§ 1385) and the People appealed. (§ 1238, subd. (a)(7).)

The People contend the rationale behind the holding of *Leon*'s "good faith" rule should apply to the invalid warrantless search conducted in this case based on the investigating police officer's "objectively reasonable" good faith reliance upon erroneous computer generated information developed solely within the judicial branch of the government. We agree and therefore reverse.

## BACKGROUND

The facts concerning the search of Downing's apartment on December 7, 1993, which produced the evidence in issue, are basically undisputed. The investigating officer received information Downing was engaged in narcotics activity. He then ran Downing's name on the police department "criminal history" computer log[3] which showed Downing was subject to a Fourth Amendment search waiver not due to expire until "12-21-95." The officer then double-checked with a "Fourth Amend[ment] Log"[4] (Log) to verify if Downing's waiver expired on the same date as in the police computer information and whether it was still valid. This procedure was in compliance with the San Diego Police Department's policy regarding verification of search waivers before conducting warrantless searches.

---

[2]All statutory references are to the Penal Code unless otherwise specified.

[3]The officer explained in detail the various computer screens that displayed Downing's name, case history, and status regarding Fourth Amendment rights waivers. He stated he used the police computer screens merely as a "quick indicator" that Downing had previously waived his Fourth Amendment rights and that such waiver was still valid.

[4]The Log is technically known as the "Search and Seizure Index," a computer-generated listing of people who have Fourth Amendment waivers which is sent to the police department monthly bound in two large volumes and which lists the expiration dates of the waivers.

Finding the dates were the same, the officer believed the search waiver was still valid and that same day proceeded to Downing's apartment building.[5] Not finding Downing home, he proceeded to the manager's office and found Downing there and advised him he intended to conduct a search of his apartment in accordance with his waiver.[6] Downing was cooperative, opening the door to his apartment for the officer, accompanying him during the search, and telling him which bedroom in the apartment was his. A pipe bomb and various parts for making pipe bombs were found in Downing's bedroom.

After the information was filed charging Downing with illegal possession of the bomb, he filed the instant motion to suppress. In addition to the above evidence, it was stipulated at the hearing that the search was conducted without a warrant,[7] that Downing's probation had expired December 21, 1992, that the search waiver had also expired that date, and that the date of expiration of the Fourth Amendment waiver in the Log was incorrect. Conceding the search was invalid, the People presented evidence to support the position that the *Leon* good faith rule should apply in this case because the investigating officer conducted the search not based on the police department's own erroneous records, but rather on erroneous records prepared by and under the control of the San Diego Superior Court.

The director of criminal operations for San Diego Superior Court, who supervises the court clerks and has responsibility for updating the "D.A. 29"[8] screen of the JURIS computer system, testified about the procedures for inputting information on that screen concerning the disposition of criminal

---

[5]The preliminary hearing transcript was entered into evidence at the suppression motion hearing to give a summary of the underlying facts of the search.

[6]The evidence at the hearing conflicted as to whether Downing told the officer his probation had expired. The officer did not remember whether Downing had said he was no longer on probation, but said that he would have searched anyway based on the information he had received about the drug activity and the verified information he had about the search waiver because in his experience "[p]eople lie to police officers, they don't want to be searched so they say they're not on probation, or they're not on parole." The officer opined "approximately a hundred percent [of the probationers] have told me they weren't on probation."

[7]In addition to not having a warrant, the investigating officer also explained he did not contact Downing's probation officer before conducting the search because he had previously had probation officers contact the probationer concerning the prospective search, so in the interests of his narcotics investigation he decided not to contact Downing's probation officer.

[8]Information on the "D.A. 29" screen was originally entered by the district attorney's office when the district attorney started JURIS (Justice Record Information System) in 1978. Since the courts were brought into the system between 1979 and 1981, the responsibility for entering the disposition of cases on screen "D.A. 29" was transferred to the courts and its personnel, with the district attorney no longer having the ability to make entries from the computer screens located in that office. Although the screen has "D.A." still on it, such is purely an "historical name."

cases in superior court.[9] As "D.A. 29" is now set up, according to oral agreement between the district attorney and the executive committee of the superior court, it is the exclusive responsibility of superior court, specifically its clerks who work directly for the judges in San Diego County, to enter case disposition information into JURIS. If probation has been granted in a criminal case and a condition of such is a Fourth Amendment search waiver, that information is entered for "D.A. 29" by the number of years or duration of probation and the closing or sentencing date. From this information, the computer, programmed by the San Diego County Department of Information Services (DIS) at the court's direction, automatically calculates the date that probation and a Fourth Amendment waiver expire. DIS then prints out a Search and Seizure Index (the Log) monthly, showing alphabetically the defendants who have waived Fourth Amendment rights and their respective expiration dates of probation.[10]

The senior systems analyst for DIS, the legal support services dimensions manager of DIS, and the project manager in the law and justice area of the Department of Justice of DIS each testified about the JURIS system in general, about the "D.A. 29" screen in particular, and agreed with the superior court supervisor's testimony that the court was responsible for the information contained in "D.A. 29." If any errors in the information contained in "D.A. 29" are brought to the attention of DIS by any agency, DIS must first check with the superior court to determine whether something should be changed in the screen. By agreement, only the superior court can direct DIS to change any data on "D.A. 29."

Specifically concerning the error in the "D.A. 29" screen concerning this case, the court clerk who made the entry error after Downing was granted probation on December 21, 1989, testified that after two and a half days of training she began entering information in the "D.A. 29" screen after sentencing hearings had concluded. However, because she was not advised as to what date was to be put in the screen for the "closing date," she put in the date that probation would expire by making her own calculations based on the minute order information. She continued with this procedure until March 1990, when she learned from other clerks that the proper closing date

---

[9]After a sentencing hearing, a court clerk writes the disposition of a criminal case in the court minutes and presents the minutes to another court clerk/key punch operator who has been trained to enter the disposition information into JURIS on screen "D.A. 29."

[10]It was explained that although the Log was originally owned by the district attorney and that agency was responsible for having it produced, the substantive information for the disposition data on "D.A. 29" was, and continues to be, provided only by the courts.

was the date of sentencing in any particular case.[11] She thus mistakenly put in "12-21-92" for the closing date in Downing's case instead of "12-21-89." By doing so, Downing's probation expiration date was extended automatically by the computer programming for "D.A. 29" to "12-21-95," which was then displayed monthly in the Log distributed to law enforcement agencies countywide.[12]

Throughout the People's presentation of evidence, the hearing judge continually asked who had the ultimate responsibility for the integrity of the system. In response, the witnesses from DIS attempted to explain that although the system was originally owned by the district attorney, it had become a "shared" system in which more than one county department used the information contained on the various JURIS screens and that the input for different screens was limited to different agencies. It further explained that just because an agency could have access to the system did not mean that it could enter information in the system. Although the district attorney's office is the entity that generally gives permission to "access" or view the JURIS system, only the superior court could enter information on the "D.A. 29" screen.[13]

As to the integrity of "D.A. 29," the superior court supervisor testified the court relies heavily on that screen to produce court calendars, to download information for reports to the Departments of Justice and Corrections and to the Administrative Office of the Courts. Since the court often uses the screen in lieu of pulling the actual court file to obtain information quickly, it intends the information entered in the screen by its clerk/keypunch operators to be accurate. In fact the court clerks are authorized to give law enforcement officers information over the telephone that they pull up on the "D.A. 29" screen. In addition, the marshal's, sheriff's and probation offices, as well as the district attorney's office, the municipal courts and police

---

[11]A second court clerk, who had been trained by the one who admitted making the error in this particular case, testified she also entered the wrong dates as closing dates in all criminal cases during a certain period of time.

[12]The superior court supervisor advised the court that since the error was brought to his attention earlier in the investigatory stages of this case, he had directed DIS to correct the data on the "D.A. 29" screen regarding Downing. When the supervisor was recalled to testify later in the hearing, he explained that a further search of all criminal files had revealed 3,000 cases countywide which possibly may have some error in the probation expiration date. He was in the process of meeting with the top court officials and judges in each court throughout the county to change procedures so that such errors would not occur in the future. He specifically stressed no one from the district attorney's office was present at these meetings and that the superior court would object to the district attorney taking back the function of entering any information on "D.A. 29."

[13]The testimony conflicted as to whether the courts could also give permission to access JURIS.

department, have access to view JURIS screen "D.A. 29" and rely on the information contained in it.

In opposition to the motion, Downing testified he told the officer who came to search his apartment that he was no longer on probation. His probation officer and a person from the Probation Department records section also testified that if the investigating officer in this case had telephoned them, as many police officers do, he could have easily been given information about Downing's probation status directly from the minute order that was kept in his file and from their own computer system, which did not rely on "D.A. 29" for probation expiration dates.

Relying on our decision in *Miranda* v. *Superior Court* (1993) 13 Cal.App.4th 1628 [16 Cal.Rptr.2d 858] (*Miranda*), the hearing judge granted the motion to suppress, stating: "I think our *Miranda* case from the Fourth District tells us that where law enforcement is responsible for the integrity of the record keeping system, only then can the exclusionary rule apply. The salutary effects of the exclusionary rule can occur only if law enforcement can make changes in the system. It seems to me, secondarily, that the authority to input information into the system is not dispositive on this issue of the integrity of the system. A lot of the agencies input into JURIS these days, but that doesn't mean that every one of those agencies has some ultimate responsibility for the integrity of the system. It appears from the evidence I've heard that virtually none of the input agencies have that ultimate responsibility. . . . But [I] do know that the JURIS system was established by the district attorney's office, and in the face of the sparse record on this issue, I would conclude that law enforcement still has that ultimate responsibility for the integrity of the system. If changes are going to be made, notification and the ability to make changes still lie within law enforcement. Factually I may be wrong. All I'm saying is, based upon the evidence that I have heard on these two days of testimony, that's the way it seems to me that law enforcement still has the ultimate responsibility. . . . Therefore it seems to me under *Miranda's* reasoning that the exclusionary rule could have some salutary effect. . . . That's the way I read . . . this case, I think that I have to conclude that the responsibility for the integrity of the system lies with law enforcement and that includes also the accuracy or inaccuracy of the input information, even though it comes from other than a law enforcement agency. [¶] Secondarily, I think that the police officer in this particular case subjectively thought he was doing what was sensible and I agree . . . that it would be reasonable in most situations for an officer to say 'Hey, if you can't rely on court records what can you rely on[.'] . . . In these type cases, I think *Miranda* is saying that where there is any reason to [suspect] inaccuracy, then a police officer must take additional steps to

double check. I believe the defendant's testimony that he mentioned he was off probation; that's a very natural thing for anybody to say right off when confronted with a threat of a search of his residence. I think *Miranda* sets up this higher standard because of the great rights that are involved here. So we're not just talking about negligence in the ordinary sense, we're talking about a special standard. I think that objectively the case law tells us that the officer should have taken an additional step after hearing . . . that the probation had ended."

The court thereafter on its own motion dismissed the charge against Downing and the People filed this instant appeal.

## DISCUSSION

■ Generally, in reviewing a determination on a motion to suppress, we defer to the trial court's factual findings which are supported by substantial evidence and independently determine whether the facts of the challenged search and seizure conform to the constitutional standard of reasonableness. (*People* v. *Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961].) Where, as here, the facts are basically undisputed, we independently review the decision, applying federal law, as well as state law where it does not conflict with federal law,[14] to evaluate the issues involved. (*In re Lance W.*, *supra*, 37 Cal.3d 873.)

■ As a starting point, we restate well established basic propositions. The Fourth Amendment to the United States Constitution assures no governmental search or seizure will occur that is unreasonable. (*New Jersey* v. *T.L.O.* (1985) 469 U.S. 325, 335 [83 L.Ed.2d 720, 730-731, 105 S.Ct. 733].) A search conducted without a warrant is presumed to be unreasonable unless it falls within one of the "specifically established and well-delineated exceptions." (*Katz* v. *United States* (1967) 389 U.S. 347, 357 [19 L.Ed.2d 576, 585, 88 S.Ct. 507]; *People* v. *Bravo* (1987) 43 Cal.3d 600, 609 [238 Cal.Rptr. 282, 738 P.2d 336].) A probation search is a recognized exception to the warrant requirement as long as the decision to search is not arbitrary or intended to harass.[15] (*People* v. *Bravo*, *supra*, 43 Cal.3d at p. 608; see also *People* v. *Mason* (1971) 5 Cal.3d 759, 762 [97 Cal.Rptr. 302, 488 P.2d 630].)

Where, however, the search is later found to be invalid, as in this case where it was conducted pursuant to a probation condition or "consent" (see

---

[14]We recognize of course that the decisions of the lower federal courts are persuasive but not controlling. (See *Raven* v. *Deukmejian* (1990) 52 Cal.3d 336, 352 [276 Cal.Rptr. 326, 801 P.2d 1077].)

[15]Downing has not challenged the police officer's decision to search his apartment as either arbitrary or mere harassment.

*People* v. *Bravo, supra,* 43 Cal.3d at p. 608) that had expired, i.e., was nonexistent, at the time of the search, a Fourth Amendment violation is shown and the question thus becomes whether such constitutional violation is appropriately remedied by the application of the judicially created exclusionary rule which prohibits the admission at trial of the evidence obtained during the unlawful search. (*Leon, supra,* 468 U.S. at p. 906 [82 L.Ed.2d at pp. 687-688].)[16]

■■■ The parties here submitted to the trial court that the California Supreme Court's holding in *People* v. *Ramirez* (1983) 34 Cal.3d 541 [194 Cal.Rptr. 454, 668 P.2d 761] (reliance on erroneous police department computer records) and our holding in *Miranda, supra,* 13 Cal.App.4th 1628 (more reliance on erroneous police department computer records) were determinative of whether the exclusionary rule would apply to suppress the evidence in this case. Based on our holding in *Miranda,* the People argued the "good faith" rule of *Leon,* consistent with *Ramirez,* would preclude application of the exclusionary rule because the computer error here was generated by the superior court and not by the police department. Downing countered that the error was not judicial, but rather ministerial, and was well within the knowledge of law enforcement which would defeat any "objectively reasonable" good faith claim under *Leon.* Contrary to the trial court's determination, we conclude the exclusionary rule should not be applied in this case.

Whether the exclusionary rule should apply to remedy a Fourth Amendment violation was the precise question the United States Supreme Court addressed in *Leon.* (*Leon, supra,* 468 U.S. at p. 906 [82 L.Ed.2d at pp. 687-688].) In answering the question the court conducted a review of the evolution of the exclusionary rule and fashioned an exception to it " 'to permit the introduction of evidence obtained in the reasonable good-faith belief that a search or seizure was in accord with the Fourth Amendment.' [Citation.]" (*Id.* at p. 909 [82 L.Ed.2d at p. 688].)

Although *Leon* examined and assessed the applicability of the exclusionary rule in the context of cases in which evidence had been seized by police officers pursuant to a search warrant, just as its reasoning has been applied to searches and seizures based upon statutory authority later declared unconstitutional (see *Illinois* v. *Krull* (1986) 480 U.S. 340, 349 [94 L.Ed.2d 364,

---

[16]As repeatedly noted, the *Leon* reasoning is that the Fourth Amendment itself does not specifically provide for the suppression of evidence obtained in violation of its commands and that a separate question is presented concerning what remedy would be appropriate to safeguard Fourth Amendment rights generally from being violated by the police in the future; i.e., have a deterrent effect against police misconduct. (*Leon, supra,* 468 U.S. at p. 906 [82 L.Ed.2d at pp. 687-688]; *Miranda, supra,* 13 Cal.App.4th at p. 1632; *People* v. *Armstrong* (1991) 232 Cal.App.3d 228, 239 [283 Cal.Rptr. 429].)

374-375, 107 S.Ct. 1160]) and upon arrest warrants later found to be invalid (*People* v. *Palmer* (1989) 207 Cal.App.3d 663, 668-670 [255 Cal.Rptr. 55]), so too its rationale applies to cases such as this where a recognized exception to a warrant is the basis for the search and seizure of the evidence sought to be suppressed. (See *People* v. *Barbarick* (1985) 168 Cal.App.3d 731, 739-740 [214 Cal.Rptr. 322].) ■ Generally, in each type of case, the justification for the search and seizure, although later found invalid, is reviewed anew to determine whether the exclusionary rule should apply. Since the rule's primary purpose is to "deter future unlawful police conduct" (*United States* v. *Calandra* (1974) 414 U.S. 338, 348 [38 L.Ed.2d 561, 571-572, 94 S.Ct. 613]), such examination necessarily focuses on whether police misconduct was in fact involved in providing the basis for the search and seizure.[17] (*Leon, supra,* 468 U.S. at p. 916 [82 L.Ed.2d at p. 694].) To determine such, a court must generally ascertain and evaluate the facts about the police investigation, "measured against a standard of objective reasonableness" (*Higgason* v. *Superior Court* (1985) 170 Cal.App.3d 929, 944 [216 Cal.Rptr. 817]), and analyze such in light of the purposes of the exclusionary rule.

■ As explained by the court in *Leon*: " 'The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official conduct was pursued in complete good faith,

---

[17]Although we declined to base our determination in *Miranda* on application of *Leon*'s good faith exception, our decision in *Miranda* is consistent with *Leon* and its reasoning. Moreover, as we noted in footnote 1 of *Miranda, People* v. *Tellez* (1982) 128 Cal.App.3d 876, 880 [180 Cal.Rptr. 579], concerning a reasonable mistake of fact entertained in good faith by the arresting police officers on information obtained from a parole officer rather than from the "collective" police network, is also consistent with *Leon*'s teachings, as the police department will seldom be deterred when evidence is excluded based on an error in its collection not made by the police. (*Miranda, supra,* 13 Cal.App.4th at p. 1635, fn. 1.)

Our research reveals that only one California case, *People* v. *Howard* (1984) 162 Cal.App.3d 8, 18-21 [208 Cal.Rptr. 353], has imputed an error made by an agency other than the police department to the police to find the exclusionary rule applicable. There a probation officer erred in informing a police officer that a full search waiver was valid for the defendant when such waiver was limited. The subsequent search was beyond the scope of the waiver and held to be unlawful. The court in *Howard* considered the probation officer to be within the "collective knowledge of . . . law enforcement' " and therefore declined to find the police officer's reliance on the probation officer's statement over the telephone objectively reasonable to qualify for the *Leon* good faith exception. (*Id.* at pp. 19-21.) We do not read *Leon* so rigidly, nor does the United States Supreme Court in *Arizona* v. *Evans*, concerning the "collective officer" network, and find the reasoning of *Howard* unpersuasive in this case. (See *Arizona* v. *Evans, supra,* 514 U.S. __ [131 L.Ed.2d 34, 115 S.Ct. 1185].)

however, the deterrence rationale loses much of its force.' [¶] . . . [¶] 'If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.' [Citations.] In short, where the officer's conduct is objectively reasonable, 'excluding the evidence will not further the ends of the exclusionary rule in any appreciable way; for it is painfully apparent that . . . the officer is acting as a reasonable officer would and should act under the circumstances. Excluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty.' [Citation.]" (*Leon, supra,* 468 U.S. at pp. 919-920 [82 L.Ed.2d at pp. 696-697], fn. omitted.)

Moreover, the court in *Leon* specifically considered whether judicial as well as police misconduct would be deterred by application of the exclusionary rule. (*Leon, supra,* 468 U.S. at p. 917 [82 L.Ed.2d at p. 695].) Concluding it would not, the court stated: "Judges and magistrates are not adjuncts to the law enforcement team; as neutral judicial officers, they have no stake in the outcome of particular criminal prosecutions. The threat of exclusion thus cannot be expected significantly to deter them." (*Ibid.*) ▐ As we reiterated in *Miranda,* the focus of the exclusionary rule is to "deter police misconduct, not to correct the errors of judges or magistrates. [Citation.] Where the defect in paperwork derives not from police negligence but from judicial error, no remedial benefit will come from suppressing the evidence." (*Miranda, supra,* 13 Cal.App.4th at p. 1632.) ▐ Thus contrary to the trial court's ruling in this case and Downing's position on appeal, it did matter who inputted the erroneous information in "D.A. 29," the computer screen on which the printed Log was based and upon which the investigating police officer relied to verify that Downing's Fourth Amendment waiver was still valid.[18]

---

[18]Our research has also found two cases from other states supportive of this position. *State v. Lanoue* (1991) 156 Vt. 35 [587 A.2d 405] held the exclusionary rule would not apply because the search in which the evidence was collected was based on information contained in the computer records of the Department of Motor Vehicles, a source of records independent of law enforcement agencies. Likewise, in *State v. Ewoldt* (Iowa Ct.App. 1989) 448 N.W.2d 676, 678, the exclusionary rule was not applied to suppress evidence of a search there where the incorrect information source was the Department of Transportation, a "trustworthy" source independent of the police department. (*Ibid.*)

Additionally, one federal appellate case has even held that when a law enforcement officer from one state relies on information received from another state's sheriff's office which confirms an outstanding warrant, it would be "objectively reasonable law enforcement activity" under *Leon* to rely on the other state's warrant, even if it later proves to be invalid. (*U.S. v. Towne* (2d Cir. 1989) 870 F.2d 880, 884-885.)

This conclusion is not only supported by numerous California cases,[19] but is also in accord with the recent United States Supreme Court decision in *Arizona* v. *Evans*, which held the application of the *"Leon* framework [in that case] supports a categorical exception to the [federal] exclusionary rule for clerical errors of court employees. [Citations.]" (*Arizona* v. *Evans, supra*, 514 U.S. at p. ___ [131 L.Ed.2d at p. 47, 115 S.Ct. at p. 1194].)[20]

---

[19]In *People* v. *Fleming* (1994) 22 Cal.App.4th 1566, 1573 [28 Cal.Rptr.2d 78], the court reached a similar result in determining the police officer's reliance on a facially valid search waiver that was later determined to be unlawful (erroneously imposed as a condition of granting diversion) was objectively reasonable so that the good faith principle of *Leon* would apply to preclude application of the exclusionary rule. (*Ibid.*) The pivotal points for the court in *Fleming* were that the error was not caused by the police and the police officer could not reasonably know the fine legal distinctions involved concerning the issuance of the search condition. (*Ibid.*) Although it is unknown from the facts in *Fleming* whether the police officer obtained his knowledge of Fleming's search condition from police records or court records, that the error had originated by the judicial branch of government (the condition had erroneously been imposed by the magistrate in the first instance) was the key factor for the court in finding the exclusionary rule would not apply there.

So, too, in *People* v. *Ivey* (1991) 228 Cal.App.3d 1423, 1426-1428 [279 Cal.Rptr. 554], the main point in determining whether to apply the exclusionary rule was whether the error in the warrant issuance was due to police or judicial error. Finding the error of official transmission of misinformation concerning the warrant in that case to be at least partially caused by the police, because it was the police department that originally notified the justice court the bench warrant should be recalled, the court in *Ivey* held *Leon*'s good faith exception to the exclusionary rule would not apply because on the facts of that case it could not be shown that the police did not have knowledge the warrant was invalid. (*Id.* at p. 1428.)

Further, in *People* v. *Barbarick, supra*, 168 Cal.App.3d at page 739, the court in applying the *Leon* good faith rule recognized the error there was caused by the magistrate in the first instance (improper legal determination made in issuing a facially valid search condition in exchange for an own-recognizance release) and not by the police. (*Ibid.*)

Also, our decision in *Miranda* is supportive of this determination as the nonapplication of the good faith *Leon* principles in that case was based on the fact the "warrantless collection of evidence [was] based upon an error generated by the police department itself." (*Miranda* v. *Superior Court, supra*, 13 Cal.App.4th at p. 1636.)

Likewise, under *People* v. *Ramirez, supra*, 34 Cal.3d 541, which we held in *Miranda* to be still precedential and not conflicting with *Leon* (*Miranda* v. *Superior Court, supra*, 13 Cal.App.4th at p. 1636), a similar result would be obtained as here because that court only declined to apply a good faith exception to the exclusionary rule because the information on which the police officer acted was based on "data which a law enforcement agency knew or should have known were in error because of inadequate or negligent record-keeping." (*People* v. *Ramirez, supra*, 34 Cal.3d at p. 552.) The court in *Ramirez* stated the "test" in determining whether such exception would apply was "not merely the good faith of the individual officer in the field, but the good faith of law enforcement agencies of which he is a part." (*Ibid.*)

[20]In *Arizona* v. *Evans*, an arrest warrant was left in a police department's computer system for 17 days after it should have been removed but for an error on the part of a justice court clerk. The Arizona Supreme Court agreed with the trial court, reversing the appellate court there, that "[w]hether the erroneous computer record was the fault of police or . . . court personnel should be of no consequence. . . ." (*State* v. *Evans* (1994) 177 Ariz. 201 [866 P.2d 869, 871].) The court found the error to be "repugnant to the principles of a free society that a person should ever be taken into police custody because of a computer error precipitated by

Still, Downing would have us ignore the fact the error here was solely caused by the superior court and find the rationale of *Leon* inapplicable because a court employee, not the judge, entered the erroneous information in the computer from which the Log was then printed. We do not, however, find this distinction of constitutional significance. Nor did the United States Supreme Court in *Arizona* v. *Evans* so find.[21] (*Arizona* v. *Evans*, *supra*, 514 U.S. at pp. ___, ___ [131 L.Ed.2d at pp. 46-48, 115 S.Ct. at pp. 1193-1194].) Clearly the exclusionary rule applies to police misconduct, not judicial department error and *Leon* requires us to determine who is responsible for the error in any particular case before applying the exclusionary rule. The court clerks/key punch operators in this case are employees of the judicial branch and work directly for the judges in the superior court. They are responsible for entering the discretionary sentencing disposition the judge has made into the court minutes and then into the "D.A. 29" screen. Like the judges and magistrates they work for, the clerks are neutral and have no stake in the outcome of any criminal prosecution. As such, they are "adjuncts" of the court, not adjuncts to the law enforcement team, and are not subject to the deterrent force the exclusionary rule is designed to visit upon the police. The specific court clerk who made the court error in this case thus was acting as part of the judicial department, her error cannot be imputed to the "collective" law enforcement department, and no purpose will be served by applying the exclusionary rule as she has long since corrected her method of entering data into "D.A. 29."[22]

---

government carelessness." (*Id.* at p. 872.) The court thereafter agreed the exclusionary rule should apply. (*Ibid.*) The dissent in *Evans* agreed with our holding in this case, that the purpose of the exclusionary rule is not served by punishing law enforcement for relying in objectively reasonable good faith on an error made by an agency of government separate from law enforcement. (*Id.* at pp. 872-874.) The United States Supreme Court agreed with the dissent and reversed the Arizona Supreme Court's decision. (*Arizona* v. *Evans*, *supra*, 514 U.S. at pp. ___, ___ [131 L.Ed.2d at pp. 41-42, 46-48, 115 S.Ct. at pp. 1189, 1193-1194].)

[21]*Arizona* v. *Evans* specifically reversed the Arizona Supreme Court's finding that ministerial acts of a court employee were different than discretionary judicial acts, and no different than law enforcement personnel clerical errors. (*Arizona* v. *Evans*, *supra*, 514 U.S. at pp. ___, ___ [131 L.Ed.2d at pp. 41-42, 46-48, 115 S.Ct. at pp. 1189, 1193-1194].)

We similarly find even the ministerial acts of judicial employees, which are performed purely to record the discretionary judicial acts in the court, part of the detached and neutral judicial team, and not part of the "law enforcement team engaged in the often competitive enterprise of ferreting out crime [with a] stake in the outcome of particular criminal prosecutions. [Citations.]" (514 U.S. at p. ___ [131 L.Ed.2d at p. 47, 115 S.Ct. at pp. 1193-1194].)

Moreover, we find it is reasonable to rely upon such "judicial" data, whether contained in a computer screen such as "D.A. 29" or in court minutes, absent some information which would put a reasonable person on notice of possible error.

[22]That the error of the court clerk is separate from the legislative departments of the government is supported by article III, section 3 of the California Constitution, which declares: "The powers of state government are legislative, executive and judicial. Persons

Having determined the reasoning of *Leon* is applicable in this case, we must turn to the circumstances leading up to the search and seizure to determine whether the reliance of the investigating police officer on the Log was "objectively reasonable."[23] Here, with knowledge that Downing was dealing in illegal narcotics activity, the investigating officer conducted a search to ascertain whether Downing was on probation and subject to a Fourth Amendment waiver. He checked the police computer for background and then checked the Log to determine when Downing's probation expired. The Log presented the officer with facially valid computer information produced by the superior court (via DIS printout) that Downing's probation and search waiver did not expire until "12-21-95." While hindsight tells us the officer might have undertaken additional investigation after Downing told him his probationary period had expired,[24] the question under *Leon* is not whether further investigation would have been possible, but whether a reasonable officer in the situation here would have believed that the Log's probation and search waiver expiration date for Downing was in error. (*People* v. *Camarella* (1991) 54 Cal.3d 592, 606 [286 Cal.Rptr. 780, 818 P.2d 63].)

We simply cannot say on this record that an objective and reasonable officer would have "known, or should have known" that the Log was in

charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." The separation of powers doctrine underscores the erroneous factual/legal finding the hearing judge below made when he stated the district attorney still had the ultimate responsibility for the accuracy and reliability of the "D.A. 29" screen and the Log. The weight of the evidence showed the superior court by agreement had taken over the responsibility for such screen and information in the Log at least 10 years before the hearing in this matter and that only the superior court could authorize a change in the data on that screen, which would then automatically be reflected in the Log. The trial judge misconstrued the authority of the district attorney, represented to be the chief law enforcement agent in the county, to grant "access" or viewing of JURIS with the programmed sentencing disposition screen exclusively provided for the JURIS system by superior court. The trial judge's finding and legal conclusion thus was erroneous as not supported by the record. (*People* v. *Leyba*, *supra*, 29 Cal.3d at pp. 596-597.)

Further, the People represented at oral argument that the superior court has corrected the numerous errors on both the "D.A. 29" screen and Log caused during the erroneous entry period concerned in this case.

[23]Both parties have conceded in their supplemental briefs that this determination is correct, i.e., that *Arizona* v. *Evans* requires the question of whether the exclusionary rule will be applied in a particular case to be analyzed under *Leon*.

[24]Although the hearing judge specifically found that Downing had told the investigating officer his probation had expired because such was a natural thing to do, the investigating officer explained he searched with Downing's cooperation anyway because in his experience probationers, like parolees, most often lie because they really do not want to be searched. Such is a reasonable conclusion since the credibility of one who has suffered a prior felony conviction is usually suspect. Thus searching in spite of Downing's denial of his probationary status was objectively reasonable under the circumstances.

error.[25] In checking it, the officer went beyond a "bare bones" investigation of relying only on police department in-house computer data. In this fast-paced, computerized society, it is absurd to require a police officer to exhaust all avenues of investigation and corroboration when he has no objective reason to question facially valid computer data produced by other than the collective law enforcement department in front of him.[26] (See *People* v. *Camarella, supra,* 54 Cal.3d at p. 606.) In fact, it is almost certain that if the investigating officer here had telephoned the superior court clerk to find out Downing's probationary status, he would have been told the same expiration date he had obtained in the Log since the court clerk would have generally pulled the information up on the screen.

In light of the above, we conclude the investigating officer here acted in objectively reasonable good faith and that to apply the exclusionary rule in this case would not serve to promote its purpose of deterring unlawful police conduct. Therefore, the trial court erred in granting the motion to suppress evidence and in its subsequent decision to dismiss the information.

---

[25]During oral argument, Downing's appellate counsel asserted our *Miranda* (*Miranda* v. *Superior Court, supra,* 13 Cal.App.4th 1628) opinion gave the San Diego Police Department notice there was defective data contained in the Log and therefore the investigating officer in this case "should have known" the Log was in error and could not have, in objective good faith, relied upon the accuracy of the information contained in it to search Downing's apartment. This position, however, is not supported by the facts underlying our determination in *Miranda,* or the evidence adduced at the hearing in this case. Neither identified the source generating the information contained in the "probation book" used in *Miranda,* or established the "probation book" was the same Log used in this case. The parties and court in *Miranda* simply proceeded on the assumption the "probation book" was a police department-generated source. As such, the holding and facts in *Miranda* would not have put a reasonable officer on notice additional investigation was required in this case.

[26]We need not now decide the question of whether police department reliance on the Log today, in its corrected form, would meet the "objectively reasonable" *Leon* standard in future cases. As Justice Souter in his concurring opinion in *Arizona* v. *Evans,* stated in response to Justice O'Connor's concurring opinion in that case which warned of reliance on a faulty recordkeeping system, "we do not answer another question that may reach us in due course, that is, how far, in dealing with fruits of computerized error, our very concept of deterrence by exclusion of evidence should extend to the government as a whole, not merely police, on the ground that there would otherwise be no reasonable expectation of keeping the number of resulting [illegal searches] within an acceptable minimum limit." (*Arizona* v. *Evans, supra,* 514 U.S. at p. __ [131 L.Ed.2d at p. 49, 115 S.Ct. at p. 1195].)

We caution, however, that where the police department has knowledge of flaws in a record or data base system, it would not seem "objectively reasonable" to rely solely on it without taking additional steps to ensure its accuracy.

## DISPOSITION

The order dismissing the criminal information against Downing is reversed. The superior court is directed to set aside the order granting Downing's motion to suppress and to enter a new order denying the motion.

Nares, J., and Haller, J., concurred.

A petition for a rehearing was denied May 4, 1995, and appellant's petition for review by the Supreme Court was denied July 20, 1995. Mosk, J., was of the opinion that the petition should be granted.