[No. A076469. First Dist., Div. Five. Dec. 11, 1997.]

In re ARRON C., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
ARRON C., Defendant and Appellant.

## COUNSEL

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Laurence K. Sullivan and Thomas A. Brady, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

PETERSON, P. J.—Arron C. appeals from a disposition placing him on probation. He contends the juvenile court erred when it denied his motion to suppress. In rejecting this argument, we will hold that evidence seized in violation of the Fourth Amendment of the federal Constitution by a police officer, acting in reasonable reliance on information obtained from a juvenile probation officer that a search condition exists, need not be suppressed if it is determined subsequently that the information was incorrect.

### I. FACTUAL AND PROCEDURAL BACKGROUND

In October 1995, a petition was filed in the Contra Costa County Juvenile Court alleging that Arron came within the provisions of Welfare and Institutions Code[1] section 602. The petition was resolved informally in January 1996. Arron was placed on probation for a period of six months. One of the conditions of probation was that Arron submit his person and residence to search, without a warrant, at any time.

---

[1]Unless otherwise indicated, all subsequent statutory references are to the Welfare and Institutions Code.

Arron was unable to stay out of trouble. On February 9, 1996, the court terminated probation and set the matter for a contested jurisdictional hearing.

Before that hearing could occur, Arron got in trouble yet again. On April 9, 1996, Detective David Ishikawa of the Concord Police Department was investigating a series of car burglaries in the area where Arron lived, so he called the probation department and spoke with Samuel Jiminez, the probation supervisor, and told him he wanted to search Arron's residence. Jiminez could not find Arron's file, so he checked his computer records. They showed, incorrectly, that Arron was still on probation and that he was subject to a search condition. Jiminez faxed that information to Ishikawa. Ishikawa and other officers then searched Arron's home without a warrant. Inside they found several items that had been stolen during a car burglary.

Based on these facts, a supplemental petition was filed alleging that Arron had received stolen property. (Pen. Code, § 496, subd. (a).) Arron filed a motion arguing the evidence seized from his home must be suppressed because the search was conducted under the authority of a probation condition that was no longer in effect. The trial court conducted a hearing on the issue, and it ruled the search was indeed illegal because it was based on a search clause that was "not operative." However, the court declined to suppress the evidence seized from Arron's home because the officers conducting the search had relied in "good faith . . . on the validity of the search clause."

Subsequently, the court sustained the supplemental petition and placed Arron on probation. This appeal followed.

## II. DISCUSSION

█  Arron contends, and the People implicitly concede, that the search in this case was illegal because it was based on a search condition that was no longer in effect. (Cf. *People* v. *Ramirez* (1983) 34 Cal.3d 541, 552 [194 Cal.Rptr. 454, 668 P.2d 761] (*Ramirez*) ["[A]n arrest based solely on a recalled warrant is made without probable cause."].) The issue here is whether the constitutional violation requires a remedy.

█  While the "Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands" (*United States* v. *Leon* (1984) 468 U.S. 897, 906 [104 S.Ct. 3405, 3411-3412, 82 L.Ed.2d 677] (*Leon*)), an exclusionary rule has developed as a "judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect" (*United States* v. *Calandra* (1974) 414 U.S. 338,

348 [94 S.Ct. 613, 620, 38 L.Ed.2d 561]). Since the rule's primary purpose is to "deter . . . unlawful police conduct" (*id.* at p. 347 [94 S.Ct. at p. 619]), it is applied most commonly where a police officer conducts a search which violates a person's Fourth Amendment rights in some significant way. However, the rule is also applied where a police officer conducts a search on the basis of faulty information from police sources. (See *Ramirez, supra,* 34 Cal.3d at p. 552.) As our Supreme Court has explained, even if an officer acts "in good faith reliance on . . . information communicated to him through 'official channels,' law enforcement officials are collectively responsible for keeping those channels free of outdated, incomplete, and inaccurate . . . information." (*Ibid.*) Accordingly, the "test . . . is not merely the good faith of the individual officer in the field, but the good faith of law enforcement agencies of which he is a part." (*Ibid.*; see also *Miranda* v. *Superior Court* (1993) 13 Cal.App.4th 1628, 1636 [16 Cal.Rptr.2d 858]; *People* v. *Armstrong* (1991) 232 Cal.App.3d 228, 241 [283 Cal.Rptr. 429].)

Outside of these two areas, however, courts have been reluctant to apply the exclusionary rule. For example in *Leon,* the issue was whether the rule should be applied to exclude evidence that is seized by a police officer conducting a search in objectively reasonable reliance on a warrant issued by a neutral and detached magistrate but that is later determined to be invalid. (468 U.S. at p. 900 [104 S.Ct. at p. 3409].) The court concluded exclusion was unwarranted under those circumstances, reasoning as follows: "First, the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates. Second, there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion. [¶] Third, and most important, we discern no basis, and are offered none, for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate." (*Id.* at p. 916 [104 S.Ct. at p. 3417], fns. omitted.) The *Leon* principles are now well established in California law. (See, e.g., *People* v. *Camarella* (1991) 54 Cal.3d 592, 602-607 [286 Cal.Rptr. 780, 818 P.2d 63]; *People* v. *Leonard* (1996) 50 Cal.App.4th 878, 884-886 [57 Cal.Rptr.2d 845].)

Similarly, in *Illinois* v. *Krull* (1987) 480 U.S. 340, 342 [107 S.Ct. 1160, 1163, 94 L.Ed.2d 364] (*Krull*), the issue was whether the exclusionary rule should be applied to a search based upon statutory authority that was later declared unconstitutional. Following the rationale of *Leon,* the court noted that legislative action was beyond the control or influence of the police department, and that suppressing evidence because statutory authority was subsequently declared invalid would have no beneficial effect upon police

work. (*Krull, supra,* at pp. 349-352 [107 S.Ct. at pp. 1166-1168].) Accordingly, the court declined to apply the exclusionary rule, holding that the police are entitled to rely on the validity of statutes, just as they are entitled to rely upon an apparently valid search or arrest warrant. (*Id.* at p. 360 [107 S.Ct. at p. 1172].)

More recently, in *Arizona* v. *Evans* (1995) 514 U.S. 1, 3-4 [115 S.Ct. 1185, 1187-1188, 131 L.Ed.2d 34] (*Evans*), the issue was whether "evidence seized in violation of the Fourth Amendment by an officer who acted in reliance on a police record indicating the existence of an outstanding arrest warrant—a record that is later determined to be erroneous—must be suppressed by virtue of the exclusionary rule regardless of the source of the error." Applying the framework developed in *Leon,* the court ruled that if a court employee was responsible for the erroneous information, exclusion of the evidence would not be warranted. "First . . . the exclusionary rule was historically designed as a means of deterring police misconduct, not mistakes by court employees. [Citations.] Second, respondent offers no evidence that court employees are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion. [Citations.] . . . [¶] Finally, and most important, there is no basis for believing that application of the exclusionary rule in these circumstances will have a significant effect on court employees responsible for informing the police that a warrant has been quashed. Because court clerks are not adjuncts to the law enforcement team engaged in the often competitive enterprise of ferreting out crime [citation] they have no stake in the outcome of particular criminal prosecutions. [Citations.] The threat of exclusion of evidence could not be expected to deter such individuals from failing to inform police officials that a warrant had been quashed." (*Evans, supra,* at pp. 14-15 [115 S.Ct. at p. 1193].) The ruling in *Evans* is also now established in California law. (See *People* v. *Downing* (1995) 33 Cal.App.4th 1641, 1654-1657 [40 Cal.Rptr.2d 176] (*Downing*) [Exclusion of evidence was not warranted where the arrest was made on the basis of erroneous information supplied by the judicial system.].)

Here, the search was conducted on the basis of faulty information supplied by Jiminez, the supervisor of the probation office, to Ishikawa, the searching police officer. For reasons that have been left unexplained, the computer system in the probation department showed appellant was subject to a search condition even though that condition was no longer in effect. Applying the principles of *Leon, Krull,* and *Evans,* we conclude the "extreme sanction of exclusion" was not warranted. (*Evans, supra,* 514 U.S. at p. 15 [115 S.Ct. at p. 1193].)

First, as was noted in *Leon* and *Evans,* the exclusionary rule was designed as a means to deter illegal conduct by police officers; and here, the incorrect

information was provided by a probation officer. While it is true that probation officers possess some of the powers of a peace officer (see § 283 & Pen. Code, § 830.5), in a general law county such as Contra Costa,[2] probation officers are appointed by and serve at the pleasure of the judge of the juvenile court (see § 270).[3] Since the juvenile probation office is, in effect, an arm of the juvenile court, we see no reason to subject probation officers to a rule designed to deter illegal police conduct.

Second, Arron has not provided, and we are not aware of, any evidence that suggests juvenile probation officers are "inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion." (*Evans, supra,* 514 U.S. at pp. 14-15 [115 S.Ct. at p. 1193].)

Third, we do not believe that applying the exclusionary rule in this context would have a significant effect on juvenile probation officers responsible for informing the police about the status of juvenile probationers. Probation officers are not "adjuncts to the law enforcement team." (*Evans, supra,* 514 U.S. at p. 15 [115 S.Ct. at p. 1193].) Instead, as persons who are appointed by and who serve at the pleasure of the juvenile court, they are more like the court employees identified in *Evans,* who have "no stake in the outcome of particular criminal prosecutions." (*Ibid.*) Furthermore, to the extent the threat of exclusion might, on some level, encourage probation officers to be more diligent about providing accurate information, a far more effective remedy already exists. If a probation officer fails to perform his job correctly, he can be disciplined or dismissed. (See § 270.) The direct remedy of discipline or dismissal is far more likely to encourage probation officers to provide accurate information than the indirect remedy of exclusion. (Cf. *Leon, supra,* 468 U.S. at pp. 917-918, fn. 18 [104 S.Ct. at pp. 3417-3418] [Imposition of the exclusionary rule is not necessary to ensure that magistrates perform their job correctly because, "If a magistrate serves merely as a 'rubber stamp' for the police or is unable to exercise mature judgment, closer supervision or removal provides a more effective remedy than the exclusionary rule."].)

The result we reach here is consistent with at least one California case that has considered a similar issue. In *People* v. *Tellez* (1982) 128 Cal.App.3d 876 [180 Cal.Rptr. 579], the police conducted a search based on information from a parole officer who said the defendant was subject to a search

---

[2] We take judicial notice of the fact that Contra Costa County is a general law county.

[3] The record does not reflect that Contra Costa County has established any sort of merit or civil service systems that govern the appointment and tenure of probation officers. (Cf. § 271.)

condition. Although that information later proved to be incorrect, the court declined to apply the exclusionary rule because the searching officers had acted "reasonabl[y]" and in "good faith" on the information from the parole officer. (*Id.* at p. 880.)

Our result is inconsistent with another case, *People* v. *Howard* (1984) 162 Cal.App.3d 8, 20-21 [208 Cal.Rptr. 353] (*Howard*), where the court ruled that a search conducted on the basis of incorrect information received from a probation officer had to be suppressed even if the searching officers had acted in good faith because the probation officer was within the collective knowledge of law enforcement. The ruling in *Howard* has been criticized by another court which stated its interpretation of the good faith exception was overly rigid. (*Downing, supra,* 33 Cal.App.4th 1641, 1652, fn. 17.) We agree with this criticism, and note further that *Howard* was decided long before the decisions in *Krull* and *Evans*, which limited and clarified the scope of the exclusionary rule. We respectfully decline to follow the holding of *Howard* on this issue.

Our dissenting colleague concludes the exclusionary rule must be applied in this case because various statutes that define the duties and responsibilities of probation officers show they are " 'adjunct[s] to the law enforcement team.' " (Dis. opn., *post,* at p. 1373.) In our view, none of the statutes the dissent cites undermines the essential fact that in a general law county such as Contra Costa, the juvenile probation department is effectively an arm of the juvenile court (see § 270). As such, we believe the probation officer whose conduct is at issue here was similar to the court employee identified in *Evans* as to whom the Federal Supreme Court declined to apply the exclusionary rule.

The dissent also interprets our opinion as "suggest[ing] that the relationship between the probation office and the juvenile court insulates a probation officer from ever being deemed an adjunct to law enforcement." (Dis. opn., *post,* at p. 1376.) That is not our holding, and we do not believe such a rule would be appropriate. Certainly, if a probation officer becomes enmeshed in law enforcement activities, such as if he actively participates in a search, it would be appropriate to conclude he is an " 'adjunct to the law enforcement team' " (*id.* at p. 1373) and, thus, apply the exclusionary rule. (Cf. *Lo-Ji Sales, Inc.* v. *New York* (1979) 442 U.S. 319, 326-328 [99 S.Ct. 2319, 2324-2325, 60 L.Ed.2d 920] [The court holds a search conducted pursuant to a warrant was invalid because the issuing magistrate was the leader of the search team and he actively participated in the search.].) However, contrary to the suggestion in the dissent, there is absolutely no evidence that Probation Officer Jiminez initiated, encouraged, or actively participated in the

search of Arron's home, so there are no grounds for concluding he acted as an " 'adjunct to the law enforcement team.' "[4]

Finally, the dissent cites *Griffin v. Wisconsin* (1987) 483 U.S. 868, 876 [107 S.Ct. 3164, 3169-3170, 97 L.Ed.2d 709] to support its conclusion that a probation officer is more like a police officer than a court employee. (Dis. opn., *post*, at p. 1376.) However, the portion of the case that the dissent cites fails to support its conclusion. The *Griffin* court stated, "Although a probation officer is not an impartial magistrate, *neither is he the police officer who normally conducts searches against the ordinary citizen.*" (483 U.S. at p. 876 [107 S.Ct. at p. 3170], italics added.) The passage from *Griffin* is, at best, equivocal on the issue under consideration here.

We conclude the trial court properly denied Arron's motion to suppress.[5]

III. DISPOSITION

The disposition is affirmed.

Haning, J., concurred.

**JONES J.,** Concurring and Dissenting.—I concur in part and dissent in part. I agree with my colleagues that the People have implicitly conceded that the search in this case was conducted in violation of Arron C.'s Fourth Amendment rights. I disagree with my colleagues as to the effect of this constitutional violation. The probation officer in this case acted sufficiently like an "adjunct to the law enforcement team" such that the juvenile court should have applied the exclusionary rule and hence granted Arron's request to suppress the evidence. I would reverse the juvenile court's jurisdictional finding.

I. FACTUAL AND PROCEDURAL BACKGROUND

Although the majority has recited some of the facts, certain critical facts are not included in that recitation. Accordingly, I provide the following summary of the evidence on this issue.

---

[4] Jiminez's comment that he "see[s] the Probation Department as a resource for the police agencies . . . to provide whatever information we have available . . ." does not change this conclusion. Jiminez's subjective beliefs are irrelevant here.

[5] Arron also contends the search of his home was illegal because it was not a genuine attempt to enforce probation but was, instead, an investigative search. (See *U.S. v. Ooley* (9th Cir. 1997) 116 F.3d 370.) We reject this argument for two reasons. First, appellant never raised this issue in the trial court so he has waived the right to pursue it on appeal. (See *People v. DeSantis* (1992) 2 Cal.4th 1198, 1216-1217 [9 Cal.Rptr.2d 628, 831 P.2d 1210].) Second, the argument is without merit because it is based on federal law, and California law controls on this point. (See *In re Tyrell J.* (1994) 8 Cal.4th 68, 80, fn. 2 [8 Cal.4th 727a, 32 Cal.Rptr.2d 33, 876 P.2d 519].)

On October 30, 1995, the Contra Costa County Probation Department filed a petition in juvenile court alleging that Arron came within the provisions of Welfare and Institutions Code section 602. Without adjudicating the truth of the allegations, the juvenile court placed Arron on "informal probation" for six months. The conditions of his informal probation were as follows: Arron was to obey the law and his parents, attend school regularly, complete three "work details" and submit his person, any vehicle under his control, and his residence to warrantless search and seizure by a peace officer at any time of the day or night with or without a warrant.

Arron did not successfully complete this period of "informal probation." On February 9, 1996, the juvenile court terminated informal probation, arraigned Arron and set the matter for contest on the allegations of the October 30 petition. On April 9, 1996, Detective David Ishikawa of the Concord Police Department was investigating a vehicle burglary. As part of that investigation, Ishikawa searched Arron's home. Ishikawa and the officers who assisted him in the search found items that had been stolen during the vehicle burglary.

On May 22, 1996, the probation department filed a two-count supplemental petition alleging that Arron had received stolen property in violation of Penal Code section 496, subdivision (a) and possessed burglar's tools in violation of Penal Code section 466. The parties stipulated that the matter would be tried by a superior court referee.

Arron moved to suppress the evidence found during the search of his residence on April 9, 1996. Detective Ishikawa testified at the suppression hearing that he conducted what he believed to be a probation search. Ishikawa explained that he spoke with the supervisor of probation officers, Probation Officer Samuel Jiminez, and gave Jiminez "a couple of names." Jiminez responded that Arron's "name was on the probation list" and faxed information about Arron's probation to Ishikawa, "including information about the search and seizure clause."

Jiminez also testified at the suppression hearing. Jiminez, like Ishikawa, explained that Ishikawa had inquired whether Arron "was on probation and if part of that probation included a search and seizure clause." Jiminez, who was not Arron's probation officer, attempted to locate Arron's "file" or "folder" and when he was not successful, he consulted the computer "available to [him] in [his] office." The computer indicated that Arron was on an informal grant of probation and that a search and seizure clause was a part of that probation. Jiminez faxed this information to Ishikawa. The record is silent as to the source of the data on Jiminez's computer. (See fn. 3, *post*.)

On cross-examination, Jiminez acknowledged that the minor's "file" often contained more complete information. On redirect, Jiminez testified that he saw "the Probation Department as a resource for the police agencies, the correctional agencies, the law enforcement agencies, to provide whatever information we have available that they have the right to have, per law, and to be a resource in that regard. . . ."

The referee denied Arron's motion and later sustained the first count of the supplemental petition and dismissed the second count.

## II.  DISCUSSION

### A.  *Introduction*

The majority acknowledges that for purposes of this appeal, we may presume that the search of Arron's home violated the Fourth Amendment. Accordingly, the question in this case is whether the exclusionary rule operates to suppress the evidence found in Arron's home. (*In re Tyrell J.* (1994) 8 Cal.4th 68, 75-76 [32 Cal.Rptr.2d 33, 876 P.2d 519] [exclusionary rule applies to Welfare and Institutions Code section 602 proceedings]; *Mapp* v. *Ohio* (1961) 367 U.S. 643 [81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933] [federal exclusionary rule applicable to the states].) I write this dissent because I disagree with my colleagues' answer to this question.

The United States Supreme Court has articulated a three-part analysis for determining whether the remedy of exclusion should apply in a particular case. (See *Arizona* v. *Evans* (1995) 514 U.S. 1 [115 S.Ct. 1185, 131 L.Ed.2d 34] *(Evans)*; *United States* v. *Leon* (1984) 468 U.S. 897, 906 [104 S.Ct. 3405, 3411-3412, 82 L.Ed.2d 677] *(Leon)*.) An important factor in that analysis is whether the individual providing the false information was an "adjunct[] to the law enforcement team." (See *Evans, supra,* 514 U.S. at p. 15 [115 S.Ct. at p. 1193]; *Leon, supra,* 468 U.S. at pp. 916-917 [104 S.Ct. at pp. 3417-3418].) The decision of my colleagues implicitly acknowledges the significance of this factor. However, my colleagues conclude that the probation officer in this case was not an " 'adjunct[] to the law enforcement team.' " (Maj. opn., *ante,* at p. 1371.) To reach that conclusion, the majority looked at one fact only: the relationship between the probation office and the juvenile court. Having found a close relationship between the probation office and the juvenile court, the majority decision considers its job done and concludes that the probation officer was not acting as an " 'adjunct[] to the law enforcement team.' " (*Ibid.*)

The majority opinion's analysis fails for two reasons. First, it overplays the relationship between the juvenile court and the probation officer. Even

though the juvenile court has some control over the probation office,[1] the probation office is not synonymous with the court or its clerks. (Cf. *Griffin v. Wisconsin* (1987) 483 U.S. 868, 876 [107 S.Ct. 3164, 3169-3170, 97 L.Ed.2d 709] [describing adult probation officer as not an impartial magistrate].)

Second, and most importantly, the majority opinion's sole focus on the relationship between the probation office and the court suggests that the relationship between the probation office and the juvenile court insulates a probation officer from ever being deemed an adjunct to law enforcement. In essence, the majority creates a categorical or blanket exception for probation officers. The majority then weakly disclaims that it has created a categorical exception and in fact, acknowledges that such an exception would not be appropriate.

The United States Supreme Court's decision in *Lo-Ji Sales, Inc.* v. *New York* (1979) 442 U.S. 319 [99 S.Ct. 2319, 60 L.Ed.2d 920] (*Lo-Ji Sales*) teaches that despite an individual's judicial role, the court must conduct a fact-specific analysis to determine whether the individual acted as an adjunct to law enforcement in a particular situation. The United States Supreme Court first articulated the notion of an adjunct to law enforcement in *Lo-Ji Sales*. In that case, the town justice issued a warrant authorizing the search of a store and the seizure of two films. (*Id.* at p. 321 [99 S.Ct. at pp. 2321-2322].) The warrant did not describe with particularity any other items to be seized. (*Id.* at p. 325 [99 S.Ct. at pp. 2323-2324].) The warrant application requested that the town justice accompany the investigator to the store for the execution of the search warrant so that the town justice could "determine independently if any other items at the store were possessed in violation of law and subject to seizure." (*Id.* at p. 321 [99 S.Ct. at pp. 2322].) The town justice agreed and while at the store directed the seizure of items in addition to the two films specified in the search warrant. (*Id.* at pp. 322-323 [99 S.Ct. at pp. 2322-2323].) The question before the United States Supreme Court was the validity of the warrant and the search and seizure of the property. (*Id.* at p. 324 [99 S.Ct. at p. 2323].) The United States Supreme Court concluded that the warrant and search and seizure violated the Fourth Amendment. The court acknowledged that a warrant authorized by a neutral and detached judicial officer is " 'a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer "engaged in

---

[1]The majority cites Welfare and Institutions Code section 270 as authority for the proposition that probation officers serve at the pleasure of the judge of the juvenile court. (Maj. opn., *ante*, at p. 1371.) I am concerned that the majority may have read section 270 too broadly to the extent the majority suggests that section 270 gives the juvenile court authority to terminate on its own initiative and based on its opinion alone, all probation officers, including deputy and assistant probation officers.

the often competitive enterprise of ferreting out crime." . . .' " (*Id.* at p. 326 [99 S.Ct. at p. 2324], citation omitted.) However, the court concluded that "the objective facts of record manifest an erosion of whatever neutral and detached posture existed at the outset. [The town justice] allowed himself to become a member, if not the leader, of the search party which was essentially a police operation. Once in the store, he conducted a generalized search under authority of an invalid warrant; he was not acting as a judicial officer but as an *adjunct law enforcement officer.*" (*Id.* at p. 327 [99 S.Ct. at pp. 2324-2325], italics added.) The court further found that it was "difficult to discern when he was acting as a 'neutral and detached' judicial officer and when he was one with the police and prosecutors in the executive seizure . . . ." (*Id.* at p. 328 [99 S.Ct. at p. 2325].)

*Lo-Ji Sales, supra,* 442 U.S. 319 demonstrates that the *conduct* of a town justice can transform that town justice into an adjunct law enforcement officer. The relationship between the probation office and the juvenile court therefore cannot bar characterization of the probation officer as an adjunct law enforcement officer.[2]

### B. *Adjunct to Law Enforcement*

I disagree with my colleagues' conclusion because they neglect to perform the factual inquiry they concede is appropriate. In lieu of this requisite factual analysis, the majority opinion concludes that the probation officer was not acting as an adjunct to law enforcement because his conduct did not rise to the level of the conduct of the town justice in *Lo-Ji Sales.* The majority opinion errs in reading *Lo-Ji Sales* as defining the bounds beyond which an individual will be found to have acted as an adjunct to the law enforcement team; *Lo-Ji Sales* merely provides one example of activity by a judicial officer where the officer was no longer acting as a neutral party but instead as an "adjunct law enforcement officer." (See *Lo-Ji Sales, supra,* 442 U.S. at p. 327 [99 S.Ct. at p. 2325].)

When I conduct the requisite factual analysis, I conclude that the probation officer in this case was acting as an adjunct to law enforcement. Unlike the town justice in *Lo-Ji Sales,* who became an adjunct to law enforcement because he interjected himself into police affairs, a probation officer enjoys, *by statute,* limited powers of a peace officer. (See Pen. Code, § 830.5.) The authority of probation officers as peace officers "extends to any place in the

---

[2]The only categorical exception to the exclusionary rule that the United States Supreme Court has recognized is with respect to clerical errors by court clerks. (*Evans, supra,* 514 U.S. at p. 16 115 [S.Ct. at p. 1194].) The role of a probation officer is vastly different from that of a court clerk.

state while engaged in the performance of the duties of their . . . employment . . . ." (Pen. Code, § 830.5.) More particularly, the authority of probation officers extends to "conditions of parole or of probation by any person in this state on parole or probation[;] . . . the escape of any inmate or ward from a state or local institution[;] . . . the transportation of persons on parole or probation[;] . . . violations of any penal provisions of law which are discovered while performing the usual or authorized duties of his or her employment[; and] . . . the rendering of mutual aid to any other law enforcement agency." (Pen. Code, § 830.5, subd. (a)(1)-(5).) Thus, by statute, not merely by circumstance, a probation officer is a peace officer as well as an aid to the juvenile court. In fact, the probation officer in this case testified that he "see[s] the Probation Department as a resource for the police agencies, the correctional agencies, the law enforcement agencies, to provide whatever information we have available that they have the right to have, per law, and to be a resource in that regard . . . ."[3]

This dual role of juvenile probation officers is necessary because of the dual nature of the duties of a juvenile probation officer. A juvenile probation officer is a source of information for the court (see, e.g., Welf. & Inst. Code, § 706 [court shall consider social study of minor prepared by probation office]), but the probation officer also monitors the juvenile's compliance with the law. (Pen. Code, § 830.5, subd. (a)(1).) Furthermore, the probation officer decides whether to file a supplemental petition requesting a change in the minor's placement, custody or commitment, including a request for commitment to the Youth Authority, in those instances where the probation officer determines that a minor (who is a ward under Welfare and Institutions Code section 602) has violated a condition of probation which does not amount to a crime. (Welf. & Inst. Code, § 777, subd. (a)(2).) When it is suspected that the juvenile has violated a condition of probation and the conduct amounts to a crime, the probation officer must be consulted before the prosecuting attorney may file a supplemental petition requesting a change in the minor's placement, custody or commitment. (Welf. & Inst. Code, § 777, subd. (a)(2).)

In this case, Jiminez, the probation officer, provided information to the police at a time when Jiminez knew the police were going to use that information to conduct a search. Jiminez's act of providing information to the police differs significantly from the actions of the court clerk described

---

[3]The majority opinion contends that the subjective belief of Jiminez is irrelevant. (Maj. opn., *ante*, at p. 1371, fn. 3.) The adjunct-to-law-enforcement analysis is relevant to the third *Leon* factor, namely, whether exclusion serves as a deterrent. (*Leon, supra*, 468 U.S. 897.) Where, as here, an individual performs a hybrid function, subjective perception, particularly when consistent with the individual's statutory duties, suggests an allegiance that is relevant to the deterrence analysis.

in *Evans, supra*, 514 U.S. 1. In *Evans*, the court clerk failed to report to the police the fact that a warrant had been quashed. (*Id.* at p. 5 [115 S.Ct. at p. 1188].) This failure to report was not in conjunction with a specific investigation but was a failure of the clerk to perform the clerk's general duty to report, a significantly different duty than that of the probation officer in this instance. (See *ibid.*)

Given the relationship between the probation office and the police, the duties of a probation officer, and the specific purpose for which Jiminez provided the information to the police, I disagree with my colleagues' conclusion that Jiminez was not acting as an adjunct to law enforcement. The conduct of the probation officer here was not that of a neutral, detached magistrate or that of a court clerk, but instead the conduct of an adjunct to law enforcement.

### C. *The Three Leon Factors*

With this understanding of the role of probation officers, the three factors identified in *Leon* can be easily applied to determine the proper result. (See *Evans, supra*, 514 U.S. at pp. 14-16 [115 S.Ct. at pp. 1192-1194]; *Leon, supra*, 468 U.S. at pp. 915-916 [104 S.Ct. at pp. 3416-3417].) First, as was noted in *Leon*, the exclusionary rule was designed as a means of deterring police misconduct. (*Leon, supra*, 468 U.S. at p. 915 [104 S.Ct. at pp. 3416-3417].) Here, we have no evidence of misconduct by the police. Instead, the evidence at most suggests negligence either on the part of the probation supervisor and/or on the part of the juvenile probation department.[4] However, a probation officer, while not strictly a police officer, plays a hybrid role of both peace officer and adjunct to the court. Thus, the facts here do not fall squarely within this first factor, but neither do they fall outside the concern addressed by this factor.

The second factor is whether probation officers are "inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors

---

[4]The computer system, which did not reflect the change to Arron's informal probation status that had occurred *two months* earlier, was clearly less than accurate. We note that the record contains no indication which entity is responsible for maintaining the computer system upon which the probation officer relied. However, to the extent any inference can be drawn from the evidence, it would be that the system, since available to the probation department, is maintained by that department. This is one way in which the evidence suggests that the probation department may have been negligent.

As for the probation supervisor whom the police officer contacted, that supervisor testified that the computer did not always contain the most complete information. As a consequence, he first attempted to look in Arron's file, an apparently better source of information. Nonetheless, when the probation supervisor could not locate the file, he consulted the computer and relied upon it in responding to the officer's query.

requires application of the extreme sanction of exclusion." (See *Leon, supra,* 468 U.S. at p. 916 [104 S.Ct. at p. 3417], fn. omitted.) The testimony at the suppression hearing established that Jiminez was a supervisory probation officer and was not assigned to Arron's case. Hence, Jiminez did not have any personal knowledge of Arron's status.

As for Jiminez's efforts to locate the probation officer responsible for Arron's case, Jiminez testified that he will respond to a police inquiry such as this one when the probation officer assigned to the juvenile's case is unavailable at that moment for any reason, even if the probation officer has simply stepped away from his desk. Jiminez could not recall why the probation officer assigned to Arron's case was not available when Jiminez received this call.

Jiminez further testified that he consulted a source of information (the computer) which he knew to be less complete than the individual files of the probationers. The record does not tell us the extent of the deficiencies in that computer system and so we cannot evaluate how serious an issue is raised by the probation officer's reliance on that system. We know this much, though: In this instance the computer failed to reflect a change in status that had occurred *two months* earlier. While the evidence with regard to this factor is limited, it does suggest that the probation officer exercised less than adequate diligence before informing the police that an individual's residence was subject to warrantless search. I therefore find that this factor weighs in favor of Arron, even if only slightly.

The final and most important factor is whether there is a basis for believing that application of the exclusionary rule in these circumstances will have a significant effect on probation officers responsible for informing the police about the status of a juvenile probationer. (*Leon, supra,* 468 U.S. at p. 916 [104 S.Ct. at p. 3417].) I conclude that it would. Probation officers, unlike a detached and neutral magistrate or a court clerk, are "adjuncts to the law enforcement team," at least to the extent that they serve as a resource to law enforcement agencies. (Cf. Pen. Code, § 830.5, subd. (a)(5).) The threat of exclusion of evidence could be expected to deter juvenile probation officers from either intentionally failing to inform police officials that informal probation had been revoked or negligently failing to consult accurate sources of information before responding to an officer's inquiry. (Cf. *People* v. *Ramirez* (1983) 34 Cal.3d 541, 552 [194 Cal.Rptr. 454, 668 P.2d 761] [inadequate or negligence record keeping by police is sufficient to warrant exclusion].)

The majority concludes that the deterrent effect of exclusion is unnecessary because the threat of discipline or dismissal of a negligent or errant

probation officer is an adequate deterrent. If the potential for such discipline were adequate justification in itself for not excluding evidence obtained in violation of the Fourth Amendment, the exclusionary rule would rarely if ever be necessary because even police officers are subject to discipline or dismissal for misconduct. The majority opinion's reliance on *Leon* in this portion of its analysis is also misplaced. The majority cites to a section of *Leon* where the Supreme Court discusses the fact that magistrates do not have a stake in the outcome of a prosecution. (See *Leon, supra,* 468 U.S. at p. 917 & fn. 18 [104 S.Ct. at pp. 3417-3418].) That portion of the Supreme Court's analysis provides little guidance here because probation officers have a stake in the outcome. Granted, the juvenile probation scheme "embraces a goal of rehabilitating youngsters who have transgressed the law, a goal that is arguably stronger than in the adult context." (*In re Tyrell J., supra,* 8 Cal.4th at p. 87.) Nonetheless when that goal fails, the probation officer can petition for a change in the juvenile's commitment, including a request for commitment to the Youth Authority. (See Welf. & Inst. Code, § 777.) As such, the probation officer cannot be described as disinterested in the outcome.

The majority decision also relies on *People* v. *Tellez* (1982) 128 Cal.App.3d 876 [180 Cal.Rptr. 579], but that decision does not provide any meaningful aid to the analysis that this court must conduct. The *Tellez* decision declined to apply the exclusionary rule to evidence obtained in reliance upon information provided to the police by a parole officer, even though the information later proved to be incorrect. (*Id.* at p. 880.) The *Tellez* decision was decided before the United States Supreme Court's decision in *Leon, supra,* 468 U.S. 897, and it reaches its conclusion without considering or deciding whether a parole officer is an adjunct to law enforcement. Accordingly, the *Tellez* decision is not instructive.

For similar reasons, I have not premised this dissent on the result reached in *People* v. *Howard* (1984) 162 Cal.App.3d 8 [208 Cal.Rptr. 353]. In *Howard,* the Court of Appeal concluded that a search conducted on the basis of incorrect information received from a probation officer had to be suppressed even if the searching officers acted in good faith. (*Id.* at pp. 20-21.) The *Howard* decision apparently concludes, albeit without any analysis, that probation officers are part of the collective law enforcement network. (*Ibid.*)

This decision has therefore focused on the three *Leon* factors. In doing so, I conclude that the first factor is at best neutral, the second factor weighs somewhat in favor of exclusion and the final factor weighs significantly in favor of exclusion. I would therefore conclude that the trial court erred in denying Arron's motion to suppress the evidence found at his home. This

evidence was the only evidence supporting the supplemental petition. Accordingly, I would reverse the trial court's order sustaining that petition.

Lastly, because I would find that the probation officer in this case was acting as an adjunct to law enforcement, I must address the People's attempt to frame this appeal as presenting the issue of whether it would be objectively reasonable for an officer to believe that a search clause remains in effect even after revocation of the informal probation which imposed that search clause. "The prosecution has the burden of establishing the officer's 'objectively reasonable' reliance. . . ." (*People* v. *Hernandez* (1994) 30 Cal.App.4th 919, 924, fn. 3 [35 Cal.Rptr.2d 916], citations omitted; see also *Leon, supra,* 468 U.S. at p. 924 [104 S.Ct. at p. 3421].) The People failed to meet that burden. The testimony consistently and solely indicated that the probation supervisor informed the police officer that Arron was on informal probation, not that informal probation had been revoked. Thus, there was no testimony regarding *any* officer's belief that a search clause remains in effect even after the informal probation which imposed that search clause was revoked. The People's assertion that a reasonable police officer would have believed the search clause remained in affect in such a situation, supported by little or no legal analysis, is simply inadequate to carry the People's burden.

For these reasons, I would reverse the trial court's order sustaining the May 22, 1996, supplemental petition.

A petition for a rehearing was denied January 2, 1998, and appellant's petition for review by the Supreme Court was denied March 25, 1998. Mosk, J., Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.