[No. C036911. Third Dist. May 30, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT BRUCE FERGUSON, Defendant and Appellant.

## COUNSEL

Maureen J. Shanahan, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Assistant Attorney General, John G. McLean, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**MORRISON, J.**—Following denial of his motion to suppress the evidence (Pen. Code, § 1538.5),[1] defendant Robert Bruce Ferguson pleaded no contest to a felony charge of possessing a controlled substance. (Health & Saf. Code, § 11377, subd. (a).) The trial court sentenced him to three years in state prison, suspended the sentence, and committed him to the California Rehabilitation Center as a narcotics addict. (See Welf. & Inst. Code, § 3051.)

Defendant claims the trial court erred by denying his motion to suppress the evidence, which had been discovered by police in a search following a traffic stop. The search was conducted based on erroneous information that defendant was on probation for a drug offense. The People claim that

---

[1]Further undesignated section references are to the Penal Code.

exclusion of the evidence is not warranted because police relied in good faith on the erroneous information and clerical staff at the county probation department were responsible for the error. In 2001, this court issued an opinion affirming the judgment, but our state Supreme Court granted defendant's petition for review and retransferred the cause to this court with directions to vacate our decision and to reconsider the cause in light of *People v. Willis* (2002) 28 Cal.4th 22 [120 Cal.Rptr.2d 105, 46 P.3d 898] (*Willis*).

We now hold that the exclusionary rule applies to deter misconduct by probation staff who were acting as adjuncts to law enforcement. Consequently, we reverse the judgment and order the trial court to exclude the evidence.

FACTS

On February 26, 2000, Police Officer Mervin Screeton of the Roseville Police Department was on patrol when he noticed a car with a broken windshield. Officer Screeton also noticed the front license plate was bent so that the numbers were obscured and the rear license plate light was lit but was not illuminating that plate. Officer Screeton pulled the car over.

Defendant was the driver and was traveling with one passenger. Officer Screeton radioed the dispatcher to check defendant's license and other information. The dispatcher checked several computer systems, including the supervised release files (SRF) database. The SRF indicated defendant was on probation in Placer County with a discharge date in 2001, for a violation of Health and Safety Code section 11378, possession for sale of a controlled substance. The dispatcher relayed this information to Officer Screeton. Officer Screeton understood from experience that persons placed on probation for that offense were ordinarily subject to a search condition.

Although defendant claimed he was not on probation, Officer Screeton relied on the information from the dispatcher and conducted a search. Officer Screeton discovered methamphetamine on defendant's person and in the car.

It was later learned that defendant had not been on probation at the time of the search and that the information in the SRF that Officer Screeton relied upon was erroneous. Although defendant was placed on searchable probation for a violation of Health and Safety Code section 11378 in 1996, in 1998 his probation was terminated early.

The county probation departments ordinarily enter information in the SRF concerning probation status. In this case, the Placer County Probation Department entered the information about defendant's probation. It was the

probation department's responsibility to update the database when defendant's probation ended early. Kenneth Englund, the manager of the adult services division of the probation department, believed that failure to update the database "was due to clerical error and an unawareness of the requirement for probation to input early terminations into the SRF file." Englund explained that as a result of the error, the "administrative supervising clerk has taken upon [herself] the responsibility to become more familiar with the statutes and to train her clerks regarding their responsibilities in inputting the information into the SRF and then maintaining information and updates after that initial entry."

The SRF is maintained by the California Department of Justice. An employee at the Department of Justice, Peggy Kelly, described the SRF as follows: "It's a [database] that came on line in 1994. Its purpose was to enhance officer safety and to provide additional supervision information to county probation departments and the federal probation[,] California Department of Corrections, California Youth Authority. It contains over five hundred thousand records currently of people that are on supervised release and some of them are not on supervised release as well and there are eight different record types in this [database]." The different record types include "[s]ex registrants, arson registrants, career criminals, violent offenders, county probation, California Department of Correction[s] parolees, California Youth Authority parolees and US probationers."

Kelly trained "law enforcement" to use the database and enter and maintain their records, she was involved in technical development of the database, and she fielded "any and all calls and concerns concerning the [database] from law enforcement [statewide]." Kelly stated that she "first came on as a field rep in the supervised release file where [she] was trained on CLETS which stands for the California Law Enforcement Telecommunications System in entering, modifying and cancelling records into the supervised release file."

## DISCUSSION

"Generally, in reviewing a determination on a motion to suppress, we defer to the trial court's factual findings which are supported by substantial evidence and independently determine whether the facts of the challenged search and seizure conform to the constitutional standard of reasonableness." (*People v. Downing* (1995) 33 Cal.App.4th 1641, 1650 [40 Cal.Rptr.2d 176].) If the facts are basically undisputed, as they are here, we independently review the trial court's legal decision. (*Ibid.*)

Here, Officer Screeton conducted a probation search in reliance on erroneous information that defendant was on probation for a drug offense. The

trial court reasonably determined that the source of the error was the probation department. ■ As framed by the parties, the issue is whether the violation of defendant's constitutional rights warrants application of the exclusionary rule, considering the probation department's responsibility for the error. The trial court concluded that the exclusionary rule was inapplicable under these circumstances.

## A. United States Supreme Court Precedent

■ The United States Supreme Court has explained that the exclusionary rule is a judicially created remedy designed to deter law enforcement misconduct by prohibiting the admission at trial of evidence obtained in violation of the Fourth Amendment. (See *United States v. Leon* (1984) 468 U.S. 897, 906 [104 S.Ct. 3405, 3411-3412, 82 L.Ed.2d 677, 687-688] (*Leon*).) "[I]t cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity." (*Id.* at p. 919 [104 S.Ct. at p. 3418].) In *Leon*, the court specifically held that the exclusionary rule does not apply to evidence discovered when police act "in objectively reasonable reliance on a subsequently invalidated search warrant." (*Id.* at p. 922 [104 S.Ct. at p. 3420].) In *Illinois v. Krull* (1987) 480 U.S. 340, 349-350 [107 S.Ct. 1160, 1166, 1167, 94 L.Ed.2d 364, 375] (*Krull*), the court held that the exclusionary rule does not apply when police act in objectively reasonable reliance on a statute later declared unconstitutional. In *Arizona v. Evans* (1995) 514 U.S. 1, 16 [115 S.Ct. 1185, 1194, 131 L.Ed.2d 34, 47] (*Evans*), the court held that "[a]pplication of the *Leon* framework supports a categorical exception to the exclusionary rule for clerical errors of court employees."

"In these cases, the high court explained that the exclusionary rule does not, and cannot, cure the constitutional violation, which is fully accomplished by the illegal search itself. [Citations.] Rather, the exclusionary rule 'operates as a judicially created remedy designed to safeguard against future violations of Fourth Amendment rights through the rule's general deterrent effect. [Citations.]' [Citation.] Thus, its ' "prime purpose" ' is to ' "effectuate" ' the Fourth Amendment's guarantee against unreasonable searches or seizures by 'deter[ring] future unlawful police conduct.' [Citation.] Moreover, because the exclusionary rule is a 'remedial device,' its application is 'restricted to those situations in which its remedial purpose is effectively advanced.' [Citation.] Thus, application of the exclusionary rule ' "is unwarranted" ' where it would ' "not result in appreciable deterrence." ' " (*Willis, supra*, 28 Cal.4th at pp. 29-30.) Accordingly, "application of the exclusionary rule depends on the source of the error or misconduct that led to the unconstitutional search and whether, in light of that source, the deterrent effect of exclusion is sufficient to warrant that sanction." (*Id.* at p. 35.)

Three primary factors underlie the United States Supreme Court's decisions. (*Evans, supra,* 514 U.S. at pp. 11, 14-15 [115 S.Ct. at pp. 1191, 1193-1194, 131 L.Ed.2d at pp. 44, 46-47]; *Krull, supra,* 480 U.S. at p. 348 [107 S.Ct. at p. 1166, 94 L.Ed.2d at p. 374] [explaining *Leon, supra,* 468 U.S. 897 [104 S.Ct. 3405, 82 L.Ed.2d 677]].) In *Evans,* the most analogous case to the instant case, the court applied the three factors as follows: "First, . . . the exclusionary rule was historically designed as a means of deterring police misconduct, not mistakes by court employees"; "[s]econd, [defendant] offers no evidence that court employees are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion"; and "[f]inally, and most important, there is no basis for believing that application of the exclusionary rule in these circumstances will have a significant effect on court employees responsible for informing the police that a warrant has been quashed." (*Evans, supra,* 514 U.S. at pp. 14-15 [115 S.Ct. at p. 1193].)

B. *State Supreme Court's Application of the Law*

 The United States Supreme Court has yet to consider whether the exclusionary rule applies if a constitutional violation stems from erroneous information provided to police by the officers or employees of a probation department. However, in *Willis, supra,* 28 Cal.4th 22, our own state Supreme Court recently considered whether the exclusionary rule applies in cases involving errors made by parole officers or employees. A close analysis of the dispositive factors in *Willis* compels the conclusion that the exclusionary rule is similarly applicable here.

In *Willis,* police had reviewed a "parole book" or "parole listing" that was apparently provided to the Bakersfield police department on a monthly basis, and that indicated Willis was on parole. (*Willis, supra,* 28 Cal.4th at p. 26.) Police showed the listing information to a parole officer from the California Department of Corrections (CDC), who confirmed that it indicated Willis was on active parole, and who directed police to search Willis's motel room. (*Ibid.*) Police and the parole officer entered the defendant's room after he answered the door, even though he did not invite them in or give them permission to search. (*Id.* at pp. 26-27.) In fact, he told them he had been discharged from parole and showed them a certificate correctly showing his discharge. (*Id.* at p. 27.) Under these circumstances, our state Supreme Court found that the trial court should have suppressed the evidence found as a result of the unlawful entry into the room. (*Id.* at pp. 28, 31-32.)

Our state Supreme Court noted that the source of the erroneous information that defendant was on parole was unclear and it was the People's

obligation to show it did not come from a law enforcement agency. (*Willis, supra,* 28 Cal.4th at pp. 35-38.) Nevertheless, the court concluded that the exclusionary rule applies to deter misconduct by either a parole officer or a CDC data entry clerk. (See *id.* at p. 38.)

The court emphasized that a parole officer is a peace officer under section 830.5, whose authority extends to rendering mutual aid to other law enforcement agencies. (*Willis, supra,* 28 Cal.4th at p. 39.) The court emphasized the rights and responsibilities of parole officers as peace officers and their particular duties to conduct searches of parolees and seize evidence. (*Ibid.*) The court also noted that the United States Supreme Court had "reviewed some of these California statutes and found that 'the unifying character of all categories of peace officers,' including 'parole . . . officers' under section 830.5, 'is their law enforcement function.' " (*Id.* at p. 40, quoting *Cabell v. Chavez-Salido* (1982) 454 U.S. 432, 443 [102 S.Ct. 735, 741, 70 L.Ed.2d 677, 686-687].) Our state Supreme Court cited the high court's reasoning: " '[T]he general law enforcement character of all California "peace officers" is underscored by the fact that all have the power to make arrests, § 836, and all receive a course of training in the exercise of their respective arrest powers and in the use of firearms. § 832.' " (*Willis, supra,* at p. 40, quoting *Cabell v. Chavez-Salido, supra,* 454 U.S. at pp. 443-444 [102 S.Ct. at p. 742].)

There is little meaningful distinction between probation officers and parole officers based on the factors our state Supreme Court has found significant. Like parole officers, probation officers are peace officers under section 830.5. Accordingly, their authority extends "[t]o the rendering of mutual aid to any other law enforcement agency" (§ 830.5, subd. (a)(5)), and "[t]o violations of any penal provisions of law which are discovered while performing the usual or authorized duties of his or her employment." (§ 830.5, subd. (a)(4).) The latter provision is significant since probation officers may enforce probation conditions (§ 830.5, subd. (a)(1)), which sometimes include search conditions.

Further, the United States Supreme Court referred to both probation and parole officers in parts of its discussion of peace officers in *Cabell v. Chavez-Salido, supra,* 454 U.S. at pages 443, 446-447 [102 S.Ct. at pages 741, 743-744, 70 L.Ed.2d at pages 687, 688-689]. In fact, the case holds that California may enforce a citizenship requirement for probation officers. (*Id.* at pp. 433, 447 [102 S.Ct. at pp. 736-737, 743-744].) In its discussion, the court described both parole and probation officers as peace officers "with narrow 'clientele.' " (*Id.* at p. 443 [102 S.Ct. at p. 742].) And the court described the broad authority, discretion, and significant police powers of probation officers. (See *id.* at pp. 445-447 [102 S.Ct. at pp. 742-744].)

Of course, exercise of the probation officer's authority is sometimes more consistent with a judicial or educational role than a police role. And adult probation officers do have significant ties to the court. In Placer County, the court appoints the chief probation officer, who oversees the probation office. (Placer County Code, § 3.08.170,[2] citing § 1203.6.) Additionally, the courts have broad discretion in imposing the probation conditions that the probation office is responsible for enforcing. (See § 1203.1, subd. (j); *People v. Lent* (1975) 15 Cal.3d 481, 486 [124 Cal.Rptr. 905, 541 P.2d 545].)

But notwithstanding the probation department's ties to the court, the probation officers and employees' significant responsibilities to enforce the law and assist law enforcement distinguish them from ordinary court employees, such as those at issue in *Evans, supra,* 514 U.S. 1 [115 S.Ct. 1185, 131 L.Ed.2d 34]. And though both probation and parole officers share an interest in the parolees' or probationers' rehabilitation, this does not diminish their law enforcement role. Like parole officers, probation officers will sometimes " 'act like police officers and seek to uncover evidence of illegal activity' " and " 'are undoubtedly aware that any unconstitutionally seized evidence that could lead to an indictment *could be suppressed in a criminal trial.*' " (*Willis, supra,* 28 Cal.4th at p. 41, quoting *Pennsylvania Bd. of Probation and Parole v. Scott* (1998) 524 U.S. 357, 369 [118 S.Ct. 2014, 2022, 141 L.Ed.2d 344, 355].) Under these circumstances, failure to apply the exclusionary rule " 'would greatly increase the temptation to use the parole officer's [or, in this case, the probation officer's] broad authority to circumvent the Fourth Amendment.' " (*Willis, supra,* 28 Cal.4th at p. 42, quoting *U.S. v. Payne* (6th Cir. 1999) 181 F.3d 781, 788.)

Our state Supreme Court's discussion in *Willis* of why the exclusionary rule applies even if a CDC data entry clerk is responsible for the error turned in part on the fact that these clerks support the parole officers in carrying out their duties. The court emphasized that whether the exclusionary rule would have a significant deterrent effect on clerks depended in part on whether they were adjuncts to law enforcement. (*Willis, supra,* 28 Cal.4th at p. 44.) Having concluded that parole officers from CDC are "part of the law enforcement team" when they carry out warrantless searches of parolees, the court commented: "Logically, then, employees *of the same department* who support parole officers in carrying out this law enforcement function—by preparing and maintaining parole lists indicating who is on active parole and subject to warrantless search—must be considered to be adjuncts to the law enforcement team." (*Ibid.*)

Accordingly, our consideration of the probation department, including its officers and employees, is guided by our own State Supreme Court's analysis and conclusions regarding the analogous role of parole officers. And

---

[2]This provision was formerly codified in chapter 14 of the Placer County Code.

consideration of the particular role of clerical staff at the probation department in entering and maintaining the type of records that police relied upon in this case likewise leads us to conclude that they are adjuncts to the law enforcement team.

Indeed, the probation department's employees have significant responsibilities with respect to record keeping and the dissemination of information. Their activities support and benefit not only the probation officers, but other law enforcement agencies. By statute, a probation officer supervising an individual on probation "shall keep a complete and accurate record in suitable books or other form in writing of the history of the case in court, and of the name of the probation officer, and his act in connection with said case; also the age, sex, nativity, residence, education, habit of temperance, whether married or single, and the conduct, employment and occupation, and parents' occupation, and condition of such person committed to his care during the term of such probation and the result of such probation." (§ 1203.10 [applying to persons over 18 years of age]; see also § 1203.7 [applying to persons over 16 years of age].) Although this information is considered part of the court's records, it "shall at all times be open to the inspection of . . . the chief of police, or other heads of the police, unless otherwise ordered by the court." (§ 1203.10.) Moreover, here clerical staff at the county probation department were responsible for entering and maintaining records in the SRF database, which is used to assist law enforcement and is operated by the Department of Justice. By participating in this program, the probation department has an established relationship with other law enforcement agencies that is designed to support their activities.

It was the similar role played by clerical staff at CDC that informed our state Supreme Court's conclusion that such employees were adjuncts to law enforcement. The court observed, "[B]y statute, CDC employees responsible for parole records play a . . . role in supporting the work of other California law enforcement officers—including police—who are also authorized by law (§ 3067) to conduct warrantless searches of parolees." (*Willis, supra,* 28 Cal.4th at p. 44.) The court noted that section 3058.5 had long provided that CDC was required to provide information about parolees to police chiefs and county sheriffs on request. (*Willis,* at p. 44; see also *People v. Ramirez* (1983) 34 Cal.3d 541 [194 Cal.Rptr. 454, 668 P.2d 761].) Further, in 1997, the Legislature greatly expanded CDC's responsibilities to disseminate information by computer. (*Willis, supra,* at pp. 44-45; citing § 3003.) Accordingly, the court concluded: "In passing these statutes, the Legislature has thus made clear its view that CDC employees who provide police with parole information are integral parts of the law enforcement team, and it has acted to recognize, formalize, and facilitate that relationship. These considerations reinforce our conclusion that CDC employees who prepare and

maintain parole lists intended for distribution to police and other law enforcement officers—which indicate who is on parole and who may be searched without a warrant—are adjuncts to the law enforcement team and that exclusion's deterrent effect is sufficient to justify applying the exclusionary rule." (*Willis*, at p. 45; see also *People v. Ramirez, supra,* 34 Cal.3d 541.)

There is only one significant factor that could arguably distinguish this case from *Willis, supra,* 28 Cal.4th 22, i.e., a probation officer did not take an active role in the search here. In *Willis,* the court found "it significant that [the parole officer] took an active role in the search in this case." (*Id.* at p. 40.) The court explained: "Thus, as relevant to applying the exclusionary rule, [the parole officer] bears little resemblance to the neutral and detached judicial officers and court clerks in *Leon* and *Evans*. Nor does she resemble the legislators in *Krull,* who, the high court found, do not act 'for the purpose of procuring evidence in particular criminal investigations.' [Citation.] Unlike those actors, [the parole officer] is an adjunct to the law enforcement team when she, as a peace officer under California law, *conducts or participates in a search,* and the threat of exclusion can be expected to alter her behavior." (*Ibid.,* italics added.)

Nevertheless, this factor is not dispositive, given our state Supreme Court's conclusion in *Willis* that even if a CDC data entry clerk were responsible for the error, exclusion of the evidence would be warranted. There is no indication that such a clerk played an active role in initiating the search in that case. Nevertheless, the court emphasized "that CDC employees who provide police with parole information are integral parts of the law enforcement team, . . ." (*Willis, supra,* 28 Cal.4th at p. 45.) As previously explained, clerical employees responsible for entering information in the SRF play a very similar role. Accordingly, "exclusion's deterrent effect is sufficient to justify applying the exclusionary rule." (*Ibid.*)

## C. *Decisions by the Court of Appeal*

In reaching its contrary conclusion, the trial court did not have the benefit of *Willis* and reasonably relied on *In re Arron C.* (1997) 59 Cal.App.4th 1365 [69 Cal.Rptr.2d 852]. In that case, Division Five of the First Appellate District held that the exclusionary rule was inapplicable where police had searched the defendant in reasonable reliance on information they obtained from a juvenile probation officer. (*Id.* at pp. 1367-1368.) As in the instant case, the police were told the defendant was still on probation, which was not true. (*Id.* at p. 1368.) The original source of the erroneous information

was faulty computer records in the juvenile probation office; however, it was unexplained why the records were erroneous. (See *id.* at pp. 1368, 1370.)

The appellate court in *In re Arron C., supra,* 59 Cal.App.4th 1365, made the following observations. First, the court determined that juvenile probation officers could not be characterized as police. (*Id.* at pp. 1370-1371.) The court explained, "While it is true that probation officers possess some of the powers of a peace officer (see [Welf. & Inst. Code,] § 283 & Pen. Code, § 830.5), in a general law county such as Contra Costa, probation officers are appointed by and serve at the pleasure of the judge of the juvenile court (see [Welf. & Inst. Code,] § 270). Since the juvenile probation office is, in effect, an arm of the juvenile court, we see no reason to subject probation officers to a rule designed to deter illegal police conduct." (*In re Arron C., supra,* at p. 1371, fns. omitted.) Second, the court found no evidence that juvenile probation officers were " 'inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion.' " (*Ibid.*) Finally, the court did "not believe that applying the exclusionary rule in this context would have a significant effect on juvenile probation officers responsible for informing the police about the status of juvenile probationers." (*Ibid.*) The court explained that probation officers were not " 'adjuncts to the law enforcement team' " but were instead more like court employees with " 'no stake in the outcome of particular criminal prosecutions.' " (*Ibid.*) The appellate court commented that the more direct remedies of discipline or dismissal would be more likely to encourage juvenile probation officers to provide police with accurate information. (*Ibid.*; see also Welf. & Inst. Code, § 270.)

A significant part of the rationale underlying *In re Arron C., supra,* 59 Cal.App.4th 1365, appears to have been undermined by *Willis, supra,* 28 Cal.4th 22.[3] Juvenile probation officers, like adult probation and parole officers, have significant law enforcement responsibilities, as explained in

---

[3]Although in *Willis* our state Supreme Court cited *In re Arron C.* on a limited point, the citation was not meant as an endorsement of the opinion itself. Our state Supreme Court included the following parenthetical explanation with its citation: "citing [*People v. Ramirez, supra,* 34 Cal.3d 541] in reaffirming that the exclusionary rule applies 'where a police officer conducts a search on the basis of faulty information from police sources,' and stating that a juvenile probation officer is an adjunct to the law enforcement team where he 'becomes enmeshed in law enforcement activities' by 'actively participat[ing] in a search.' " (*Willis,* 28 Cal.4th at p. 49.) In citing *In re Arron C.* and other cases on such limited grounds, the Supreme Court "express[ed] no opinion regarding . . . the specific holding in any of these cases, because it is unnecessary to do so here." (*Willis, supra,* at p. 49, fn. 8.) The court further cautioned: "We similarly express no opinion about the conclusion reached in any of the decisions we discuss that involved facts different from the facts before us. We consider those decisions only as they are relevant to our analytical approach here." (*Ibid.*)

section 830.5. Nevertheless, the appellate court apparently accorded this factor little weight and devoted little discussion to it. On the other hand, the dissenting justice in that case emphasized the "dual role" of a juvenile probation officer as "a peace officer as well as an aid to the juvenile court." (*In re Arron C.*, *supra*, at p. 1378 (conc. & dis. opn. of Jones, J.).) Moreover, there are two potential distinctions between *In re Arron C.* and the instant case.

First, *In re Arron C.* involved a juvenile probation office where the probation officers were appointed by and served at the pleasure of the juvenile court. (*In re Arron C.*, *supra*, 59 Cal.App.4th at p. 1371; Welf. & Inst. Code, § 270.) The appellate court noted that the county had not established "any sort of merit or civil service systems that govern the appointment and tenure of probation officers." (*Id.* at p. 1371, fn. 3.) Although here the chief probation officer of the adult division of the probation department is appointed by the court and may be removed for good cause, the court does not have the power to appoint and remove individual employees of the department. (See § 1203.6.) Accordingly, the adult probation office at issue here is less an arm of the court than was the juvenile probation office in *In re Arron C.*

The second distinction between the instant case and *In re Arron C.*, *supra*, 59 Cal.App.4th 1365, is that here the source of the erroneous computer information was shown to be the SRF, a database operated by the Department of Justice to assist law enforcement. By participating in the SRF, the probation department was plainly acting to further law enforcement objectives, i.e., as an adjunct to the law enforcement team. It appears, however, that the error in *In re Arron C.* stemmed from "the computer system in the probation department" itself. (*Arron C.* at p. 1370.)

In supplemental briefing, the parties also discuss the recent decision in *People v. Hamilton* (2002) 102 Cal.App.4th 1311 [126 Cal.Rptr.2d 273]. In that case, Division Four of the First Appellate District held that the exclusionary rule was inapplicable where police stopped defendant's car based on faulty information from the Department of Motor Vehicles (DMV) indicating the vehicle's registration had expired. (*Id.* at pp. 1313-1314.) Given the substantial differences between the issues presented, *Hamilton* is not helpful to our analysis. Not least of these distinctions is that, unlike CDC or the local probation departments, the DMV is not responsible for supervising convicted criminals and ensuring their compliance with the law.

## DISPOSITION

The judgment is reversed and the matter remanded to the trial court with directions to suppress the evidence uncovered in the search discussed above.

Blease, Acting P. J., and Raye, J., concurred.