132 Cal.Rptr.2d 621 (2003)
107 Cal.App.4th 1131
The PEOPLE, Plaintiff and Respondent,
v.
Kevin Bryan SPENCE, Defendant and Appellant.
No. C028033.
Court of Appeal, Third District.
April 9, 2003.
Review Denied July 23, 2003.[*]
*622 Todd D. Riebe, Madera, and Colin J. Heran, Sacramento, under appointments by the Court of Appeal, for Defendant and Appellant.
Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Robert Anderson, Assistant Attorney General, Stan Cross and Alison Elle Aleman, Deputy Attorneys General, for Plaintiff and Respondent.
*623 MORRISON, J.
This case presents the question whether the exclusionary rule should apply to a probation search conducted by police officers in reliance on a probation roster that, by design, omitted information concerning judicially imposed limitations on the authority to conduct a probation search.
A judge may grant probation conditioned on a defendant's consent to warrantless searches. On occasion, a judge may limit the scope of the defendant's consent to searches for particular contraband, such as drugs or stolen property. Here, defendant consented solely to searches for stolen property as a condition of his probation. The probation department provided to a law enforcement agency a computer generated roster of probationers subject to search conditions. The roster's design omitted any limitations on the scope of the probationer's consent, and thus did not reflect that the scope of defendant's consent was limited to searches for stolen property. Relying on this incomplete roster, police officers searched defendant's residence for drugs, believing that his consent was without limitation.
The Attorney General argues that this case involves the good faith exception to the exclusionary rule. In our original opinion we rejected that argument, explaining that law enforcement agencies may not rely in good faith on information conveyed to them in a report designed to omit a judicially imposed limitation on the scope of a probation search.[1] We explained that the good faith exception does not permit reliance on the "objectively reasonable" belief of individual police officers when law enforcement agencies know or should know of flaws in their recordkeeping and reporting systems. (See People v. Downing (1995) 33 Cal.App.4th 1641, fn. 26, 1657, 40 Cal.Rptr.2d 176.)
Our Supreme Court granted the People's petition for review and retransferred the cause to this court with directions to vacate our decision and to reconsider the cause in light of People v. Willis (2002) 28 Cal.4th 22, 120 Cal.Rptr.2d 105, 46 P.3d 898 (Willis). Having done so, we again conclude that the good faith exception to the exclusionary rule does not apply to this case.

FACTUAL AND PROCEDURAL BACKGROUND
Defendant Kevin Bryan Spence was convicted of auto theft in 1994 and was placed on probation.
In 1996, a petition was filed alleging defendant failed to obey all laws in that he possessed drug paraphernalia and a controlled substance.
Defendant made a motion to suppress the evidence that supported the petition. The following evidence was presented at the hearing on the motion.
On January 23, 1996, Woodland Police Officers Matthew Sears and Steven Gill conducted a probation search of defendant's residence. Prior to the search, Sears had obtained information that defendant was on probation with a search condition. The source of the information was a computer-generated roster prepared by the Yolo County Probation Department and furnished to the Woodland Police Department. Sears either viewed the roster personally or obtained the information from a police department employee. Before *624 conducting the search, Sears verified the information with Yolo County Communications and with defendant himself. Sears asked defendant whether he was on probation and searchable, and defendant answered, "yes." Sears did not recall asking defendant whether there were "any special conditions about his search," and defendant did not mention that his consent was limited to searches for stolen property.
Officer Sears testified that he searched defendant's residence primarily for narcotics. The officers found drug paraphernalia and a small amount of methamphetamine in defendant's bedroom.
The probation roster did not reflect the limitation on the search condition, and the probation department has no procedure for including such information in its roster. If a probationer has any type of search condition, the roster so indicates by a numeric code ("01") or it simply says, "search," "for any type of search clause." The police agencies that receive the roster are "aware that 01 means search." "But there's no other language attached to that." The absence of any indication that defendant was on "searchable probation for stolen property only" was "not a clerical error." Rather, the omission was "what happens usually" under the system used by the police and probation departments.[2] Officer Gill testified that he was not aware of any probationers on the probation roster who have "specific searchable clauses."[3]
Robert Gonzales, the supervising probation officer who instituted the roster in approximately 1982, testified that this is the only Yolo County case in which he has seen a search clause limited "to a particular type of property." However, Gonzales instituted a policy under which approximately 50 felony-drunk-driving cases had search consents that were limited to alcohol.
Defendant's motion to suppress evidence was denied, and the petition's allegations were found true. He was sentenced to state prison for two years. Execution of sentence was suspended and he was reinstated on probation on the condition, among others, that he serves 365 days of incarceration.

DISCUSSION
Defendant contends the probation search violated his Fourth Amendment rights because it was conducted without a warrant pursuant to a narrowly drawn search condition that was limited to searches for evidence of theft and did not encompass a search for narcotics. (People v. Howard (1984) 162 Cal.App.3d 8, 13, 208 Cal.Rptr. 353; cf. People v. Ramirez (1983) 34 Cal.3d 541, 552, 194 Cal.Rptr. 454, 668 P.2d 761.) We agree.
"The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, *625 we exercise our independent judgment. [Citations.]" (People v. Glaser (1995) 11 Cal.4th 354, 362, 45 Cal.Rptr.2d 425, 902 P.2d 729.)
"An adult probationer consents to a waiver of his Fourth Amendment rights in exchange for the opportunity to avoid serving a state prison sentence. [Citation.] `"[W]hen [a] defendant in order to obtain probation specifically [agrees] to permit at any time a warrantless search of his person, car and house, he voluntarily [waives] whatever claim of privacy he might otherwise have had."'" (People v. Reyes (1998) 19 Cal.4th 743, 749, 80 Cal. Rptr.2d 734, 968 P.2d 445, quoting People v. Bravo (1987) 43 Cal.3d 600, 607, 238 Cal.Rptr. 282, 738 P.2d 336.) The consent is a complete waiver of the defendant's Fourth Amendment rights, save only his right to object to searches conducted for harassment or in an unreasonable manner. (People v. Reyes, supra, at pp. 753-754, 80 Cal.Rptr.2d 734, 968 P.2d 445.) For present purposes, a search is conducted in an unreasonable manner if it exceeds the scope of the probationer's consent as articulated in the search clause. (People v. Woods (1999) 21 Cal.4th 668, 681, 88 Cal. Rptr.2d 88, 981 P.2d 1019.) "[W]hether the purpose of the search is to monitor the probationer or to serve some other law enforcement purpose, or both, the search in any case remains limited in scope to the terms articulated in the search clause." (Ibid; People v. Bravo, supra, at pp. 605, 607, 238 Cal.Rptr. 282, 738 P.2d 336.)
Defendant claims the search exceeded the scope of his consent because the search clause authorized searches "for stolen property" but not searches "[p]rimarily for drugs."[4] The phrase "for stolen property" places both spatial and volitional limitations upon warrantless searches: it limits them to places where stolen property is likely to be found,[5] and to searchers who subjectively intend to search for stolen property.[6] Defendant argues the scope of his consent was exceeded because the officers subjectively intended to search "primarily" for drugs that had not necessarily been stolen.
The People do not refute defendant's contention regarding the officers' subjective intent. Nor do they identify facts demonstrating that the warrantless search of his residence was objectively reasonable, regardless of the officers' subjective intent, *626 because of evidence of observed narcotics activity or otherwise. (Cf. People v. Woods, supra, 21 Cal.4th 668, 88 Cal. Rptr.2d 88, 981 P.2d 1019 [search of probationer's residence was objectively reasonable based on evidence that drugs were being sold out of her house, regardless of the officer's subjective intent to investigate the probationer's boyfriend].) Finding no objectively reasonable basis for the warrantless search, we conclude it was unreasonable under the Fourth Amendment.
The People contend the good faith exception to the exclusionary rule applies because the searching officers relied upon the probation roster, "a judicial document that on its face authorized a generalized probation search." (Original italics.) Under the guidance of Willis, supra, 28 Cal.4th 22, 120 Cal.Rptr.2d 105, 46 P.3d 898, we disagree.
In Willis, a Bakersfield police officer "`checked the parole book,' or `parole listing,' `in the Bakersfield Police Department,' which indicated that defendant was on parole. According to [the officer], the `parole book' was `provided to the Police Department every month.'" The officer conveyed the information to a state parole officer from the California Department of Corrections (CDC), and showed her "`the parole list.'" The parole officer told the police officer "`the list indicated [that defendant] was on active parole,'" and she "`directed'" the police officer "`to make a search'" of defendant's motel room. When defendant complied with the police officer's request to open the door, he showed the officers "a certificate of discharge from the CDC, which correctly showed that he had, in fact, been discharged from parole nine months earlier[.]" Willis, supra, 28 Cal.4th at pp. 26-27, 120 Cal.Rptr.2d 105, 46 P.3d 898.) The record did not identify the source of the incorrect information on the parole list; it could have been a parole officer or clerical employee of CDC, or an employee of the local police agency. (Id. at pp. 35-36, 120 Cal.Rptr.2d 105, 46 P.3d 898.) The trial court refused to suppress evidence found in the motel room and the Court of Appeal affirmed, but our Supreme Court reversed. (Id. at pp. 28, 52, 120 Cal.Rptr.2d 105, 46 P.3d 898.)
Willis rejected the People's contention, also made here, that the evidence was admissible under the good faith exception to the exclusionary rule. The court held that CDC parole agents and CDC data entry clerks are "adjuncts to the law enforcement team," to whom the exclusionary rule applies. (Willis, supra, 28 Cal.4th at pp. 38-51, 120 Cal.Rptr.2d 105, 46 P.3d 898.)
Willis explained the controlling principles as follows. The United States Supreme Court "announced and applied" "what is commonly known as the good faith exception to the exclusionary rule" in "a trilogy of cases, United States v. Leon (1984) 468 U.S. 897 [104 S.Ct. 3405] (Leon), Illinois v. Krull (1987) 480 U.S. 340, 355 [107 S.Ct. 1160] (Krull), and Arizona v. Evans (1995) 514 U.S. 1 [115 S.Ct. 1185] (Evans). In these cases, the high court explained that the exclusionary rule does not, and cannot, cure the constitutional violation, which is fully accomplished by the illegal search itself. [Citations.] Rather, the exclusionary rule `operates as a judicially created remedy designed to safeguard against future violations of Fourth Amendment rights through the rule's general deterrent effect. [Citations.]' [Citation.] Thus, its `"prime purpose"' is to `"effectuate"' the Fourth Amendment's guarantee against unreasonable searches or seizures by `deter[ring] future unlawful police conduct.' [Citation.] Moreover, because the exclusionary rule is a `remedial device,' its application is `restricted *627 to those situations in which its remedial purpose is effectively advanced.' [Citation.] Thus, application of the exclusionary rule `"is unwarranted"' where it would `"not result in appreciable deterrence."' [Citation.]
"In Leon, the high court held that where police officers act in objectively reasonable reliance on a search warrant that is issued by a detached and neutral magistrate but is later found to be invalid for lack of probable cause, the deterrent effect of exclusion is insufficient to warrant the exclusionary rule's application. [Citation.] In reaching this conclusion, the court considered exclusion's potential effect first on judicial officers who issue warrants, and then on police officers who execute warrants and on the policies of their departments. [Citation.] Regarding the former, the court concluded that for three reasons, the potential behavioral effect on judicial officers is insufficient to justify exclusion. [Citation.] `First, the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates. Second, there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion. [¶] Third, and most important, [there is] no basis ... for believing that exclusion ... will have a significant deterrent effect on the issuing judge or magistrate. Many of the factors that indicate that the exclusionary rule cannot provide an effective "special" or "general" deterrent for individual offending law enforcement officers apply as well to judges or magistrates. And, to the extent that the rule is thought to operate as a "systemic" deterrent on a wider audience, it clearly can have no such effect on individuals empowered to issue search warrants. Judges and magistrates are not adjuncts to the law enforcement team; as neutral judicial officers, they have no stake in the outcome of particular criminal prosecutions .... Imposition of the exclusionary sanction is not necessary meaningfully to inform [them] of their errors, and ... admitting evidence obtained pursuant to a warrant while at the same time declaring that the warrant was somehow defective will [not] in any way reduce [their] professional incentives to comply with the Fourth Amendment, encourage them to repeat their mistakes, or lead to the granting of all colorable warrant requests.' [Citation.]
"Regarding exclusion's potential effect on individual law enforcement officers and the policies of their departments, the high court explained generally that the deterrence rationale for the exclusionary rule `"necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct...."' [Citation.] Thus, exclusion is proper `"only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional ...."' [Citation.] Given these underlying principles, the court concluded that exclusion will not further the exclusionary rule's ends where `an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope. In most such cases, there is no police illegality and thus nothing to deter. It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probablecause determination or his judgment that the form of the warrant is technically sufficient. "[O]nce the warrant issues, there is literally nothing more the policeman can *628 do in seeking to comply with the law." [Citation.] Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.' [Citation.] Thus, `the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion.' [Citation.]
"However, suppression remains appropriate where an officer's reliance on a search warrant was not `objectively reasonable,' i.e., the officer had `no reasonable grounds for believing that the warrant was properly issued.' [Citation.] `"Grounding the [good faith exception] in objective reasonableness ... retains the value of the exclusionary rule as an incentive for the law enforcement profession as a whole to conduct themselves in accord with the Fourth Amendment." [Citations.]' [Citation.] Thus, in determining whether the good faith exception applies, `[i]t is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination.' [Citation.] For example, the court cautioned, `[nothing' in Leon `suggests' that an officer may use `a "bare bones" affidavit' to obtain a warrant `and then rely on colleagues who are ignorant of the circumstances under which the warrant was obtained to conduct the search. [Citation.]' [Citation.] Moreover, the good faith exception does not apply `where the issuing magistrate wholly abandoned his judicial role,' where the affidavit was `"so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,"' or where the warrant was `so facially deficienti.e., in failing to particularize the place to be searched or the things to be seizedthat the executing officers cannot reasonably presume it to be valid.' [Citation.] Thus, courts must determine `on a case-by-case basis' whether the circumstances of an invalid search pursuant to a warrant require the exclusionary rule's application. [Citation.] `[T]he government has the burden of establishing "objectively reasonable" reliance [citation]....' [Citation.]
"Three years after Leon, the high court in Krull used a similar analysis in finding the good faith exception applicable where `officers act in objectively reasonable reliance upon a statute authorizing warrantless administrative searches,' and the statute is later `found to violate the Fourth Amendment.' [Citation.] The court first reasoned that excluding evidence obtained under these circumstances `would have as little deterrent effect on the officer's actions' as would excluding evidence obtained in objectively reasonable reliance on a search warrant. [Citation.] `Unless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law. If the statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not deter future Fourth Amendment violations by an officer who has simply fulfilled his responsibility to enforce the statute as written.... "Penalizing the officer for the [legislature's] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." [Citation.]' [Citation.]
"Nor, the court reasoned in Krull, is exclusion justified by its potential effect on legislators. [Citation.] First, `legislators, like judicial officers, are not the focus of the [exclusionary] rule,' which is `aimed at deterring police misconduct.' [Citation.] Second, there is no `evidence to suggest *629 that legislators "are inclined to ignore or subvert the Fourth Amendment." [Citation.] Although legislators are not "neutral judicial officers," as are judges and magistrates [citation], neither are they "adjuncts to the law enforcement team." [Citation.]' [Citation.] In performing their duty to establish a criminal justice system, `legislators' deliberations of necessity are significantly different from the hurried judgment of a law enforcement officer "engaged in the often competitive enterprise of ferreting out crime." [Citation.]' [Citation.] Moreover, they must `take an oath to support the Federal Constitution' and courts must presume that they act constitutionally. [Citation.] Finally, there is `no reason to believe that applying the exclusionary rule will have' a significant deterrent effect on legislators. [Citation.] `Legislators enact statutes for broad, programmatic purposes, not for the purpose of procuring evidence in particular criminal investigations. Thus, it is logical to assume that the greatest deterrent to the enactment of unconstitutional statutes ... is the power of the courts to invalidate such statutes. Invalidating a statute informs the legislature of its constitutional error, affects the admissibility of all evidence obtained subsequent to the constitutional ruling, and often results in the legislature's enacting a modified and constitutional version of the statute, as happened in this very case. There is nothing to indicate that applying the exclusionary rule to evidence seized pursuant to the statute prior to the declaration of its invalidity will act as a significant, additional deterrent.' [Citation.] In any event, any `incremental deterrent' effect of exclusion in this context, when `weighed against the "substantial social costs"' of exclusion, is insufficient to justify the exclusionary rule's application. [Citation.]
"As in Leon, the court in Krull stressed that the good faith exception does not apply if the officer does not act reasonably, and that `the standard of reasonableness ... is an objective one; [it] does not turn on the subjective good faith of individual officers. [Citation.]' [Citation.] Thus, `a law enforcement officer [cannot] be said to have acted in good-faith reliance upon a statute if its provisions are such that a reasonable officer should have known that the statute was unconstitutional. [Citation.]' [Citation.] Nor can `[a] statute ... support objectively reasonable reliance if, in passing the statute, the legislature wholly abandoned its responsibility to enact constitutional laws.' [Citation.]
"More recently, in Evans, the high court discussed the good faith exception as applied to court employees. There, upon entering the defendant's name into a computer terminal during a traffic stop, a police officer received notice of an outstanding arrest warrant. During the ensuing arrest, the officer found marijuana in the defendant's car. The police then reported the arrest to the justice court, which advised that the arrest warrant had been quashed 17 days before the arrest. The defendant later moved to suppress the evidence, arguing that the good faith exception did not apply because police error, rather than judicial error, caused the invalid arrest. [Citation.] Testimony at the suppression hearing indicated that the error in the police computer may have been caused by a court clerk in failing to inform the sheriffs office that the warrant had been quashed, rather than by a records clerk in the sheriffs office. [Citation.] The trial court made no factual finding on this issue, holding that exclusion was required whether the error was caused by the court clerk or by the police. [Citation.] The Arizona Supreme Court agreed with the trial court and `rejected' a `"distinction ... between clerical errors committed by law enforcement personnel and *630 similar mistakes by court employees." [Citation.]' [Citation.]
"The high court in Evans held that the refusal of the Arizona courts to distinguish between errors of the police and errors of the court was `contrary to the reasoning' of Leon and Krull. [Citation.] The court explained that under those cases, `[i]f court employees were responsible for the erroneous computer record, the exclusion of evidence at trial would not sufficiently deter future errors so as to warrant such a severe sanction.' [Citation.] Under these circumstances, exclusion `could not be expected to alter the behavior of the arresting officer,' because he `"[was] bound to arrest"' and `"would [have been] derelict in his duty if he"' had not. [Citation.] Nor, the high court reasoned, could exclusion be justified by its effect on court clerks. `First, ... the exclusionary rule was historically designed as a means of deterring police misconduct, not mistakes by court employees. [Citations.] Second, [the defendant] offer[ed] no evidence that court employees are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion. [Citations.] To the contrary, the Chief Clerk of the Justice Court testified at the suppression hearing that this type of error occurred once every three or four years. [Citation.] [¶] Finally, and most important, there is no basis for believing that application of the exclusionary rule in these circumstances will have a significant effect on court employees responsible for informing the police that a warrant has been (mashed. Because court clerks are not adjuncts to the law enforcement team engaged in the often competitive enterprise of ferreting out crime [citation], they have no stake in the outcome of particular criminal prosecutions. [Citations.] The threat of exclusion of evidence could not be expected to deter such individuals from failing to inform police officials that a warrant had been quashed. [Citations.]' [Citation.] Because the Arizona courts ordered suppression without determining whether police or court employees were responsible for the computer error, the high court therefore reversed the judgment and remanded for further proceedings. [Citation.]" (Willis, supra, 28 Cal.4th at pp. 29-34, 120 Cal.Rptr.2d 105, 46 P.3d 898.)
Willis held that, "under these cases, application of the exclusionary rule depends on the source of the error or misconduct that led to the unconstitutional search and whether, in light of that source, the deterrent effect of exclusion is sufficient to warrant that sanction. (See Krull, supra, 480 U.S. at p. 360, fn. 17 [107 S.Ct. 1160] [whether exclusionary rule applies `in a particular context depends significantly upon the actors who are making the relevant decision that the rule is designed to influence'].)" (Willis, supra, 28 Cal.4th at p. 35, 120 Cal.Rptr.2d 105, 46 P.3d 898.)
In this case, the "error or misconduct" began with information systems or probation department employees who designed and maintained a computer system that homogenized all search consents into one-word ("search") or two-digit ("01") code, even though consents are not reasonably susceptible to such oversimplification. That error was compounded by law enforcement agencies' failures to recognize that the condensed search information cannot be adequate or complete, and that the single word or pair of digits must be supplemented by means such as examining the probation order before a search is conducted. Because both law enforcement and probation actors may be influenced by suppression, we follow Willis in concluding that the remedy is appropriate. (Willis, supra, 28 Cal.4th at p. 35, 120 Cal.Rptr.2d 105, 46 P.3d 898.)
*631 The probation roster is generated by a computer system that by design is incapable of distinguishing between a limited right to search and a general right to search. In this case, the system performed perfectly: it gave its users the incomplete data that it was designed to give. Moreover, the system will continue to deliver incomplete data in every probation search case until it is appropriately modified.[7]
In Willis, the court considered whether data entry clerks and a certain parole officer, who were possible sources of the error, were "adjuncts to the law enforcement team" to whom the deterrence rationale would apply. (Willis, supra, 28 Cal.4th at pp. 38-39, 120 Cal.Rptr.2d 105, 46 P.3d 898.) Here, however, the computer system's designer and maintainermost probably information systems or probation department employeesare unknown.[8] Moreover, the probation department's clerical staff, which enters data and distributes finished rosters, has no means of overriding the system's limitations. Thus, we have no occasion to consider whether any specific clerks or probation officers are adjuncts to the law enforcement team. (Id. at pp. 38-39, 120 Cal.Rptr.2d 105, 46 P.3d 898.)
Instead, we consider whether the probation roster serves a purpose that suggests its preparers are adjuncts of the law enforcement team. Willis considered this issue with respect to the parole list that CDC prepares and disseminates to other law enforcement agencies. Willis explained that for years, agencies had routinely requested and received parolee information from CDC on request. Then in 1997, the Legislature enacted a statute that greatly expanded CDC's duty to provide parole information to police and other law enforcement agencies. CDC was directed to release available information, including date of parole and discharge, regarding paroled inmates who are released in their jurisdictions. The information "shall come from the statewide parolee data base," "shall be provided utilizing a computer-to-computer transfer in a format usable by a desktop computer system," and "shall be continually available to local law enforcement agencies upon request." (§ 3003, subd. (e)(2), (3).) CDC was made responsible for, and given control over, the program, resources and staff required for the computer system. (§ 3003, subd. (k).) Section 3003 was enacted as the culmination of a pilot project for computer transfer of parole information from the CDC to local law enforcement agencies in San Bernardino County. When the Legislature considered expanding the project, it was told that the information the CDC was providing through the computer link was proving to be a valuable and useful law enforcement tool for investigating and fighting crime. Later, when the project was made statewide, the CDC told the Legislature that the computer system is "valuable to detectives" because it "`allows [them] to search parolee information if a parolee is a prime target in criminal investigations, as they historically have been.' [Citation.]" The Legislature was also told that the computer system "enhances law enforcement's ability to carry out the mandate of ... earlier legislation [giving] priority *632 to the safety of the community....' [Citation.]" (Willis, supra, 28 Cal.4th at pp. 14-45, 120 Cal.Rptr.2d 105, 46 P.3d 898.) Willis concluded that, "[i]n passing these statutes, the Legislature has thus made clear its view that CDC employees who provide police with parole information are integral parts of the law enforcement team, and it has acted to recognize, formalize, and facilitate that relationship. These considerations reinforce our conclusion that CDC employees who prepare and maintain parole lists intended for distribution to police and other law enforcement officerswhich indicate who is on parole and who may be searched without a warrantare adjuncts to the law enforcement team and that exclusion's deterrent effect is sufficient to justify applying the exclusionary rule." (Id. at p. 45, 120 Cal. Rptr.2d 105, 46 P.3d 898.)
The probation roster's purpose is closely analogous to that of the CDC parole list because it informs "police and other law enforcement officers" "who is on [probation] and who may be searched without a warrant." (Willis, supra, 28 Cal.4th at p. 45,120 Cal.Rptr.2d 105, 46 P.3d 898.) The list provides a "useful law enforcement tool for investigating and fighting crime," especially when probationers are "targets" of criminal investigations. (Ibid.) It would be anomalous to conclude that, unlike CDC employees who prepare and maintain the parole list, county employees who perform the same tasks for the probation roster are not adjuncts to the law enforcement team. This is so even though the Legislature evidently has yet to "recognize, formalize, and facilitate" the probation roster process. (Ibid.)
The computer system's flawed design was compounded in this case because the searching officers failed to recognize that the condensed search information cannot be adequate or complete, and that the single word or pair of digits must be supplemented by means such as examining the probation order before a search is conducted.
The standard of objective reasonableness requires that officers conducting probation searches "have a reasonable knowledge of what the law prohibits." (United States v. Leon, supra, 468 U.S. at p. 919, fn. 20, 104 S.Ct. 3405.) We have noted that search clauses may be limited to searches for particular contraband, such as drugs or stolen property. The practice is neither new, nor novel, nor confined to this state. (E.g., In re Anthony S. (1992) 4 Cal.App.4th 1000, 1002, 6 Cal.Rptr.2d 214, fn. omitted [gang member; search for "`stolen property / alcohol ... gang graffiti, gang paraphernalia'"]; People v. Howard, supra, 162 Cal.App.3d 8, 13, 208 Cal. Rptr. 353 [search clause limited to narcotics and dangerous drugs]; see People v. Reed (1994) 23 Cal.App.4th 135, 139, 28 Cal.Rptr.2d 509 [Nevada search clause limited to stolen property].) Nor is the practice unknown to Yolo County, where Probation Officer Gonzales recalled approximately 50 felony-drunk-driving cases with search consents limited to alcohol. Even if Yolo County courts now issue limited search consents infrequently, persons on probation to any California court may reside there or, with permission, relocate there. It follows that Yolo County law enforcement officers conducting probation searches in an objectively reasonable manner must "have a reasonable knowledge" that search consents may be limited and that the law "prohibits" exceeding the limitation. (United States v. Leon, supra, 468 U.S. at p. 919, fn. 20, 104 S.Ct. 3405.)[9]
*633 Yolo County police agencies do know that the probation roster reduces all search consents to just one word ("search") or just two digits ("01"), with "no other language attached to that." Police officers who are reasonably well-trained on probation searches would know that, for the reasons stated in the foregoing cases and demonstrated at the suppression hearing, the consent issue cannot be reduced to a single word or pair of digits. (See United States v. Leon, supra, 468 U.S. at p. 922, fn. 23, 104 S.Ct. 3405; People v. Camarella (1991) 54 Cal.3d 592, 603, 286 Cal.Rptr. 780, 818 P.2d 63.) An officer acting in an objectively reasonable manner may not know that the "barebone[ ]" probation roster is inaccurate, but the officer would or should know that it is incomplete. (People v. Willis, supra, 28 Cal.4th at p. 32, 120 Cal.Rptr.2d 105, 46 P.3d 898.) Thus, the roster may be the starting point of a reasonable officer's inquiry whether consent justifies a search, but it cannot be the end point.
Here, the probation roster was not the end point but it may as well have been. Officer Sears testified that, before conducting the search, he contacted Yolo County Communications, which "checked their current list." The evidence did not establish whether that list is the probation roster or something else.[10] If the Yolo County Communications list is the probation roster, then using the list to verify the roster merely "rubber stamp[s]" incomplete information. (United States v. Leon, supra, 468 U.S. at p. 914, 104 S.Ct. 3405; Willis, supra, 28 Cal.4th at p. 43, 120 Cal.Rptr.2d 105, 46 P.3d 898.) If the list is prepared independently by law enforcement, then law enforcement failed in its duty to keep official channels free of incomplete and inaccurate search information. (Id. at p. 46, 120 Cal.Rptr.2d 105, 46 P.3d 898.) Neither scenario justifies an exception to the exclusionary rule. Finally, the People did not meet their burden to show that the list is prepared independently by a judicial or probation entity unrelated to law enforcement. (Id. at p. 32, 120 Cal.Rptr.2d 105, 46 P.3d 898.)
Officer Sears's only other attempt at verification was to speak with defendant, who said "yes" when asked whether he was on probation and whether he was searchable. However, Sears did not ask the crucial question whether defendant's consent was limited.[11] Defendant's failure to volunteer the unsought information does not make up for the lack of reasonable attempt at verification. On this record, none of the attempts at verification addressed the issue of limited consent, and none reasonably supplemented the probation roster.
The persons sought to be deterred from reliance on the probation roster are not only those responsible for its maintenance and those who used it to conduct the present search, but also those law enforcement officers throughout Yolo County who rely on the probation roster, despite its inadequacy, without supplementing it with sufficient additional information. Law enforcement officials are collectively responsible for keeping official channels free of outdated, incomplete, and inaccurate search information. (Willis, supra, 28 Cal.4th at p. 46, 120 Cal.Rptr.2d 105, 46 P.3d 898; see *634 People v. Ramirez (1983) 34 Cal.3d 541, 552, 194 Cal.Rptr. 454, 668 P.2d 761; In re Arron C. (1997) 59 Cal.App.4th 1365, 1369, 69 Cal.Rptr.2d 852.) Law enforcement thus has a collective responsibility to avoid reliance on the probation roster, as presently constituted, to determine the scope of probation search clauses. (People v. Downing, supra, 33 Cal.App.4th at p. 1657, fn. 26, 40 Cal.Rptr.2d 176 ["where the police department has knowledge of flaws in a record or data base system, it would not seem `objectively reasonable' to rely solely on it without taking additional steps to ensure its accuracy"]; cf. Arizona v. Evans, supra, 514 U.S. at p. 17, 115 S.Ct. 1185 (cone. opn. of O'Connor, J.) ["it would not be reasonable for the police to rely ... on a recordkeeping system, their own or some other agency's, that has no mechanism to ensure its accuracy over time and that routinely leads to false arrests, even years after probable cause for any such arrest has ceased to exist (if it ever existed)" (italics omitted)].) The deterrent effect of suppression of evidence is appropriately focused on law enforcement, which has the means to verify the scope of a probationer's consent by, e.g., consulting the probation order itself. (Compare Willis, supra, 28 Cal.4th at p. 42, 120 Cal. Rptr. 2d 105, 46 P.3d 898 [police officer "could have done more than simply rely on" parole officer's review of the parole list].)
In her concurring opinion in Arizona v. Evans, supra, 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34, Justice O'Connor noted, "In recent years, we have witnessed the advert of powerful, computer-based recordkeeping systems that facilitate arrests in ways that have never before been possible. The police, of course, are entitled to enjoy the substantial advantages this technology confers. They may not, however, rely on it blindly. With the benefits of more efficient law enforcement mechanisms comes the burden of corresponding constitutional responsibilities." (Id. at pp. 17-18, 115 S.Ct. 1185.)
In this case, law enforcement did not fulfill its responsibility to supplement the information in the probation roster by, e.g., having a court or probation employee examine the probation order. (But see People v. Howard, supra, 162 Cal.App.3d at p. 13, 208 Cal.Rptr. 353.) The good faith exception to the exclusionary rule does not permit admission of the evidence seized in the probation search. Moreover, exclusion will deter similar police omissions in future cases. The suppression motion should have been granted.
In a petition for rehearing following our original opinion, the People contended for the first time that the exclusionary rule should not be applied to probation revocation proceedings. We explained that the contention was not properly before us because it had not been raised in the trial court or in the respondent's brief. (People v. Whitson (1998) 17 Cal.4th 229, 244, fn. 4, 70 Cal.Rptr.2d 321, 949 P.2d 18.) We went on to explain that, if the People's contention were properly before us, we would conclude it has no merit.
The rationale for refusing to apply the exclusionary rule to probation revocation proceedings is the lack of any "incremental deterrent effect that will realistically be achieved" by excluding the evidence. (In re Ralph Martinez (1970) 1 Cal.3d 641, 649, 83 Cal.Rptr. 382, 463 P.2d 734 [parole revocation hearing]; Pennsylvania Bd. of Probation and Parole v. Scott (1998) 524 U.S. 357, 364, 118 S.Ct. 2014, 141 L.Ed.2d 344 [same]; People v. Harrison (1988) 199 Cal.App.3d 803, 811, 245 Cal.Rptr. 204 [probation revocation hearing]; People v. Nixon (1982) 131 Cal.App.3d 687, 691, 183 Cal.Rptr. 878 [same]; see People v. Reyes, supra, 19 Cal.4th at pp. 755-756, 80 Cal. *635 Rptr.2d 734, 968 P.2d 445.) Here, however, the incremental deterrent effect is substantial and the foregoing rationale does not apply.
The probation roster that was relied upon in this case had been designed to omit the limitations that the sentencing judge had placed upon defendant's search condition. If court, police and probation officials are put on notice that reliance upon the roster in its present form will result in the exclusion of evidence, all those officials will have a powerful incentive to redesign the probation roster or to supplement its information. If the roster is redesigned or supplemented, this case will have had a significant deterrent effect.

DISPOSITION
The judgment is reversed.
We concur: DAVIS, Acting P.J., and NICHOLSON, J.
NOTES
[*] The Supreme Court ordered that the opinion be not officially published. (See California Rules of Court Rules 976 and 977.)
[1] In a supplemental brief pursuant to California Rules of Court, rule 29.4, the People claim we described the report as "`disguised to omit a judge imposed limitation.'" (Italics added.) On the contrary, we did not claim that any material in the report had been disguised.
[2] The trial court adopted defense counsel's assertion that the county's computer system "doesn't have the capabilities to differentiate between ... a limited search and a general search."
[3] Officer Gill's testimony states the obvious; the inadequate roster did not contain any information about "specific searchable clauses." The People read Gill's testimony too broadly, as suggesting he was not aware of "any probationer" who had a limitation on being searched. (Original italics.) If Gill was unaware of any such probationer, the most likely reason is the inadequate roster.
[4] The probation order containing the search clause is not in the appellate record. We analyze the clause as it was read into the record at the suppression hearing.
[5] Defendant does not claim the officers exceeded a spatial limitation by searching places he did not intend to expose to official view. He does not argue the officers searched his stomach, body cavities or other places where stolen property was not likely to be found. Nor does the record suggest the officers searched any place defendant did not knowingly expose to official examination as a condition of avoiding a prison sentence. (People v. Reyes, supra, 19 Cal.4th at p. 749, 80 Cal.Rptr.2d 734, 968 P.2d 445.) The methamphetamine was found in defendant's bedroom, a place where stolen property could easily have been secreted.
[6] People v. Woods, supra, 21 Cal.4th 668, 88 Cal.Rptr.2d 88, 981 P.2d 1019, explains that the validity of a probation search ordinarily should not turn on the searching officer's subjective intent. (At pp. 680-681.) However, Woods acknowledges that a probation search "in any case remains limited in scope to the terms articulated in the search clause." (At p. 681.) In this case, the terms articulated in the search clause required a certain subjective intent, without which there was no consent to a search of any duration. (Id. at p. 680, 88 Cal.Rptr.2d 88, 981 P.2d 1019.) Thus, the present search was not "`confined in area and duration'" by the consent "`exception to the warrant requirement,'" within the meaning of Woods. (Ibid.)
[7] The system described at the suppression hearing delivers incomplete data in every probation search case because it has no means of cautioning an officer that a particular search consent is qualified, or, conversely, of assuring the officer that the search consent is not qualified.
[8] Probation Officer Gonzales testified he "instituted" the system, but he did not claim he designed or maintained it.
[9] We thus reject the People's contention that, although the "flaw" in the Yolo County system "is now exposed," the "police officer's [sic] reliance was objectively reasonable because they did not know or have reason to know the probation roster was inaccurate."
[10] Probation Officer Gonzales was not aware whether the probation roster is provided to Yolo County communications.
[11] We thus reject the People's argument that "[t]here was nothing more the officers could have done" after they "asked [defendant] if he was searchable, and [defendant] (unlike the defendant in Willis) said he was."